[No. S073253. Feb. 19, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED ANTHONY GUTIERREZ, Defendant and Appellant.

## COUNSEL

H. Mitchell Caldwell, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury convicted Alfred Anthony Gutierrez of the second degree murder of Dawn Nakatani (Pen. Code, § 187, subd. (a)),[1] the first degree murder of Mario Orellano (§ 187, subd. (a)), and the attempted willful, deliberate, and premeditated murder of Sergio Medina (§§ 187, subd. (a), 664). The jury found true sentencing enhancements as to the murder of Mario Orellano and attempted murder of Sergio Medina that defendant personally used a firearm (§ 12022.5, subd. (a)(1)) and that defendant committed the offenses for the benefit of, at the direction of, or in association with, a criminal street gang (§ 186.22, subd. (b)(4)). The jury also found true a multiple-murder special-circumstance allegation. After a penalty trial, the jury returned a verdict of death. The trial court denied defendant's motions for a new trial and for a reduction or modification of the sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Introduction

On October 1, 1996, Dawn Nakatani, defendant's ex-girlfriend and the mother of his child, was beaten, strangled, and left for dead in her Baldwin

---

[1] All further statutory references are to the penal code unless other wise indicated.

Park home. A little before noon, defendant had driven to Nakatani's home, picked up defendant and Nakatani's three-year-old son, and left. A few minutes after noon, Nakatani's roommate returned home to find Nakatani unconscious and not breathing. Nakatani was transported to Queen of the Valley Hospital, where she died at 12:48 a.m. on October 2, 1996, after being briefly resuscitated.

On October 11, 1996, defendant drove past a gas station where he saw Ralph Benevente, Mario Orellano, Sergio Medina, and others meeting to make plans for the evening. Defendant returned to the gas station moments later, got out of his car with an AK-47-type firearm, and fired several shots at Benevente's car, killing Orellano and injuring Medina.

### B. Guilt Phase

#### 1. Murder of Dawn Nakatani

##### a. Prosecution Evidence

Nakatani and her three-year-old son shared a home with Maria Rios and her daughter. On the morning of October 1, 1996, Rios left the house in the morning while Nakatani and the son slept. Rios came home for lunch around 12:06 p.m. and noticed that Nakatani's room was in disarray. Nakatani's purse and wallet were on Rios's bed, there were candy wrappers at the top of the stairs—a vantage point from which the television could be viewed—and there was a videocassette case for a Casper video on top of the television cabinet. Things were out of place in Rios's bedroom, and Rios's bedroom window blinds were open and her bed pillows flattened as though someone had been sitting on her bed looking down at the street through her blinds. Rios became frightened and looked through the rest of the house, finding Nakatani lying facedown in the bathroom/laundry room of the home. Nakatani had a bandana tightly knotted twice around her neck; Rios had to use her hands and teeth to untie the bandana. Nakatani was not breathing when Rios found her, and her face was bruised and swollen. Rios ran outside screaming and a neighbor called 911. Nakatani was transported to the hospital, where she was briefly resuscitated but died of her injuries early the next morning.

Kim Pinto, Nakatani's sister, testified that defendant had called her the evening before Nakatani was found strangled to tell her that he was upset that Nakatani would not let him see his son, and that she had "better talk to [Nakatani] or else he will take care of her his way." Defendant's grandmother testified that defendant, along with two men, dropped defendant's son off at her house shortly after noon on October 1, 1996, even though she was too

infirm to babysit. Earlier that day, defendant's mother, Janet Gutierrez, had spoken with Nakatani to make arrangements to pick up the boy. Janet Gutierrez arrived at Nakatani's home a little after noon, saw Rios screaming, and was told that the child was not there. Janet Gutierrez left Nakatani's home, called defendant's grandmother from a nearby gas station to see if defendant was at his grandmother's house, and learned that defendant had dropped the child off there earlier that day.

Two days later, defendant went to the police in response to a notice in the newspaper that he was being sought in connection with Nakatani's murder. Deputy Sheriff Sean Heieck testified that, as they were walking to a jail cell, defendant told him that Nakatani used methamphetamine and had sex with multiple partners. Shortly thereafter, Deputy Heieck put defendant in an "isolation cell," where he was able to observe defendant sitting alone and heard defendant thrice repeat, unprovoked by any questioning, "I had to do what was best for my son." Sergeant David Watkins testified that defendant was released later that day because the case could not be presented to the district attorney within 48 hours.

Dr. Eugene Carpenter, Jr., the deputy medical examiner, testified that Nakatani died by ligature strangulation, and had also suffered abrasions and blunt-force trauma consistent with being held against carpet while being strangled. The strangulation must have occurred no more than 20 minutes before emergency personnel began administering cardiopulmonary resuscitation, which began at 12:14 p.m.

More than two months later, on December 7, 1996, Pinto was driving defendant's son to his maternal grandmother's house and mentioned that the next day they were going to visit his mother's grave at the cemetery. The boy responded that he would "untie my mommy," that he saw his "daddy and his mean friend tie[] up my mommy," and that he hit his dad to get him to stop, at which point defendant carried him upstairs and placed a Casper video in the videocassette recorder for him to watch.

b. *Defense Evidence*

Defendant testified that he had been concerned about the environment in which his son was being raised, which sometimes had led to arguments with Nakatani. On October 1, 1996, although defendant had planned for his parents to pick up his son from Nakatani's home, he received a call from Nakatani requesting that he come to pick up the child because his parents were running late. Defendant did not have a driver's license, but he told Nakatani that he would get a ride over and pick up their son at 11:30 a.m.

Defendant and two unnamed cohorts[2] drove to Nakatani's home and walked into her garage to pick up defendant's son. Defendant and Nakatani began arguing, which escalated into a physical altercation. Nakatani grabbed defendant's shirt and scratched his chest, and the two exchanged kicks. Defendant testified that he walked out of the garage with his son while the two men walked towards Nakatani. The two men returned to the car one or two minutes later, and defendant, the boy, and the two men drove away.

When the two men returned to the car, defendant asked them what had happened with Nakatani. They replied, "She got crazy with us." When defendant asked them to elaborate, one of them said, "I don't want to talk about it in front of your son." After dropping his son off at defendant's grandmother's house, defendant again asked what had happened. Defendant testified that they replied that she "got crazy with them, and they f. . .ed her up." When defendant again asked them to elaborate, they replied, "Don't worry about it." Defendant became worried and fled to Mexico, but returned the next day and went to the police after learning that he was being sought in connection with Nakatani's death.

### 2. *Murder of Mario Orellano and Attempted Murder of Sergio Medina*

#### a. *Prosecution Evidence*

On October 11, 1996, Ralph Benevente, along with his friends Mario Orellano, Sergio Medina, and twin brothers Aaron and Salvador Cervantes, were out for the evening in Benevente's car. Shortly before midnight, the five men were at a gas station on Francisquito Avenue in Baldwin Park. The gas station was well lit, and there were a number of other people there. Benevente and Medina testified that they saw an old, "beat-up," red or maroon car drive past the gas station. The car stopped, and defendant got out of the passenger's seat to stare at, or "mad dog," Orellano. The red car drove away, and Benevente became nervous and asked Orellano to get in his car. Benevente moved his car so that it was between the gas station's office area and the gas pumps. Benevente and Medina then saw the red car return and saw defendant jump out of the passenger side of the vehicle with an AK-47-type assault rifle and fire six shots. Medina was shot three times, once in his back, and once in each leg. Medina spent a week and a half in the hospital, and was confined to bed for three months. Orellano was shot in his abdomen, which caused him to bleed to death internally.

Benevente identified defendant as the person who initially got out of the red car and stared at Orellano, and identified him as the shooter in a photo

---

[2] Defendant testified that he would not name the two men he claimed accompanied him to Nakatani's home on October 1, 1996, because, if he did, his "life would be in grave danger."

lineup, in a corporeal lineup, and at defendant's preliminary hearing. He noted that defendant's appearance had changed in that his mustache was thicker at the time of trial. Medina, who initially did not wish to cooperate with police out of concern for his safety, ultimately identified defendant as the shooter in the photo and corporeal lineup. Medina also noted that defendant's appearance changed from the photo lineup to the corporeal lineup in that defendant's hair was longer and his mustache might have been larger, although his face appeared the same.

Salvador and Aaron Cervantes, members of the Varrio 213 gang, did not wish to identify defendant, and Salvador feared reprisal. The Cervantes brothers noted that the artist's sketch and the photograph of defendant shown in the photo lineup looked like the shooter. The brothers refused to participate in a corporeal lineup.

On December 15, 1997, as defendant was being moved out of the general prison population, Deputy Sheriff Thomas Garcia searched defendant's property and found a number of "kites," which are notes that inmates illegally pass to other inmates or to individuals outside of prison while incarcerated. Deputy Garcia did not "go into detail" in his search of defendant's property; once he discovered the contraband, he packed all of the notes into the folder in which they were found and called his colleague to pick up the documents.

Among the "kites" were notes identifying Benevente as the "main rata," and identifying Benevente, Medina, and Salvador and Aaron Cervantes by name and by age. One of the notes identified Benevente's vehicle and license plate number; another indicated that Benevente had "identified [defendant] at a lineup." One note contained Salvador Cervantes's address and a map to Benevente's home. Another note referred to Benevente's car, included his address, and directed the recipient of the note to "solve this problem." Defendant refused to give a full handwriting exemplar and refused to write Ralph Benevente's name. A handwriting expert confirmed that the kites were likely written by the same person, but could not identify that person as defendant because the exemplar defendant provided was of limited utility.

A search of defendant's home revealed a box of papers and photographs depicting gang members. Gang expert Deputy Sheriff Scott Lusk testified that he had known defendant for eight years as a member of the Puente 13 gang, and he had had several dozen conversations with defendant over the eight-year period preceding defendant's trial. Defendant, known as "Dinky," was a member of the Perth clique of the Puente 13 gang, and his tattoos affiliated him both with the gang and with the clique. One of the kites found in defendant's possession was signed, "Dinky G., LaPuente 13." Deputy Lusk testified that someone who was trying to distance himself from a gang would not sign kites with his gang moniker and gang name, as defendant had done.

### b. *Defense Evidence*

On October 11, 1996, defendant was staying with his sister, Pam Gutierrez, about two or three miles away from the gas station where the shooting occurred. That evening, defendant's family celebrated defendant's son's third birthday, although defendant was prevented from attending the celebration by a court order. Defendant's cousin, Michael Ramirez, attended the party, and then went to visit defendant around 10:00 p.m. Ramirez stayed with defendant until about 12:30 a.m. on October 12, 1996, and did not see defendant leave the house, although Ramirez left once to buy beer shortly after arriving at the house. Ramirez signed a declaration prepared by defendant's father outlining his recollection of seeing defendant on October 11, 1996. In his declaration, Ramirez stated that defendant did not have a mustache in October of 1996, although he testified at trial that he was not really sure.

Benevente, Medina, and Salvador and Aaron Cervantes all testified that the shooter had a mustache. Benevente and other witnesses assisted police with preparing a composite sketch of the shooter; all witnesses involved in preparing the sketch believed that the shooter had hair on his head, while two witnesses who did not participate in preparing the sketch recalled that the shooter was bald. In defendant's booking photograph taken on October 3, 1996, in connection with the murder of Nakatani, defendant did not have a mustache. Defendant testified that it takes him "a month and [a] half, [or] two months" to grow a mustache. The photograph of defendant included in the photo lineup was taken in 1992 and depicted him with a mustache, but his more recent booking photograph depicted him without a mustache.

### C. *Penalty Phase*

#### 1. *Prosecution Evidence*

The People presented evidence that defendant had two prior arrests for assaulting Nakatani. In the first incident, defendant punched Nakatani in the side of her head, threw her to the ground, and threatened to kill a member of her family after she refused to have sex with him. Nakatani subsequently claimed she lied about this incident, and defendant pled guilty to a misdemeanor violation of section 273.5, inflicting corporal injury on a cohabitant. Several months later, defendant was arrested after assaulting Nakatani. The People also presented evidence that defendant, while incarcerated, punched another inmate in the head while the inmate covered up defensively. Defendant refused to stop when ordered to do so, and had to be physically subdued.

The People presented victim-impact evidence. Nakatani's brother testified that he had been with her the night she died in the hospital, that her death

was traumatic, and that he thought about her every day. Nakatani's sister, Kim Pinto, testified that she and Nakatani had been very close, and Nakatani's son was the same age as Pinto's youngest child. Pinto testified that Nakatani's son had been a normal child before his mother's murder, but following her death the boy became angry and aggressive, had nightmares, was afraid to go to sleep, was quick-tempered, and was very emotional. Pinto testified that Nakatani's mother became very depressed after her daughter's death, and that Nakatani's father could not eat or sleep following Nakatani's death and that he quit working one week after her death and died of a heart attack six months later.

Orellano's father testified that Orellano was a good child and did not get into trouble with the law. Orellano's brother testified that he was in shock and his job performance was impacted by his brother's death.

### 2. Defense Evidence

A number of people testified on defendant's behalf. Defendant's father testified that he had provided defendant with a stable family, ensured that defendant received good educational opportunities, and ensured that he graduated from high school. Defendant's father testified that he believed defendant would take direction from authority figures if imprisoned, and that although defendant had chosen gang life, he would "have to find himself again," which he would be able to do if imprisoned.

Defendant's Little League Baseball coach testified that defendant had been a good worker. Robert Alderete, defendant's godfather, testified that defendant had received a religious upbringing. Alderete testified that he believed defendant would do well in prison, and that he could be a credit to the institution because he would help others while incarcerated. Margaret Alderete, defendant's godmother, testified that defendant had received a wonderful education, had good role models like his godparents, understood his religion, and knew right from wrong.

## II. DISCUSSION

### GUILT PHASE

### A. Denial of Marsden Motion

Defendant contends that the trial court failed to conduct a sufficient inquiry under this court's holding in People v. Marsden (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (Marsden), and erroneously denied his motion to substitute counsel in violation of his right to counsel under the Sixth

Amendment to the United States Constitution. At defendant's pretrial conference on January 15, 1998, defendant requested and received a *Marsden* hearing. Defendant claimed that appointed counsel, Antonio J. Bestard, had failed to thoroughly interview defendant prior to a January 15, 1998 trial-setting conference, had not communicated adequately with defendant, had not explained to defendant the manner in which he would seek the return of materials confiscated from defendant's jail cell, had responded to defendant's request to file a motion for a change of venue by telling defendant that he was "not O.J. Simpson," and had told the prosecutor that this case was not like his last one, which had involved the strangulation murder of the defendant's mother.

Bestard responded to defendant's allegations, explaining that although he had been appointed only one month prior to the pretrial conference, he had begun to familiarize himself with the voluminous record, had interviewed defendant, had accepted defendant's collect telephone calls, and had spoken on numerous occasions with defendant and members of defendant's family. With respect to the documents confiscated from defendant's jail cell, Bestard had explained several times to defendant's sister that he could not seek the return of the documents without the court's permission, and it was unlikely that the court would grant that permission. Counsel also explained that his comment to the prosecutor related to the complexity of the case and certainly was not intended to be a joke, as defendant contended.

■ "As we have stated, 'a *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement.' (*People v. Hines* (1997) 15 Cal.4th 997, 1025 [64 Cal.Rptr.2d 594, 938 P.2d 388].)" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1320 [63 Cal.Rptr.3d 433, 163 P.3d 118].) As defendant admits, there is no absolute right to substitute counsel. (*Marsden, supra,* 2 Cal.3d at p. 123.) A trial court is required to substitute counsel " 'in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused.' " (*Ibid.*) Alternatively the trial court must substitute counsel where it is demonstrated that counsel and the defendant are embroiled in an irreconcilable conflict. (*People v. Abilez* (2007) 41 Cal.4th 472, 488 [61 Cal.Rptr.3d 526, 161 P.3d 58].) The decision to substitute counsel is within the discretion of the trial court; this court will not find an abuse of discretion unless the trial court's failure to substitute counsel would " ' "substantially impair" the defendant's right to effective assistance of counsel.' " (*Ibid.*)

Here, we conclude that the trial court made a proper inquiry and did not abuse its discretion by concluding that it was unnecessary to substitute

counsel. Defendant primarily asserts that the trial court failed to make an appropriate inquiry under *Marsden*, which requires that a trial court "listen[] to [a defendant's] reasons for requesting a change of attorneys." (*Marsden, supra*, 2 Cal.3d at p. 123.) Here, the trial court did just that—the trial court asked defendant to list the grounds upon which he believed Bestard had provided inadequate representation and the grounds upon which he believed that there was an irreconcilable conflict with counsel. Defendant listed his concerns with counsel, and the trial court then asked Bestard to respond. Counsel provided a thorough response to the concerns raised by defendant. Defendant was given an opportunity to respond, and the trial court then denied defendant's motion, finding that representation was adequate. We conclude that the trial court made an adequate inquiry as to the existence of a conflict between defendant and counsel, and as to the adequacy of Bestard's representation.

Defendant contends that trial counsel's representation was inadequate because, defendant alleges, Bestard failed to consult with defendant, failed to make "critical motions," and lacked preparation. Defendant cites *Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1477 (overruled in part on other grounds in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017) for the proposition that inadequate preparation implies that there exists an irreconcilable conflict between a defendant and his attorney. In *Bland*, defense counsel spent only 15 to 20 minutes with the defendant prior to trial, failed to prepare the defendant to take the witness stand, and failed to investigate exculpatory eyewitnesses. (*Bland, supra*, 20 F.3d at p. 1477.) There is no evidence here that Bestard was not fully prepared for trial; defendant objects only to the amount of time counsel spent with him prior to the January 15, 1998 pretrial conference. Most significantly, however, the *Bland* court held that the trial court violated the defendant's Sixth Amendment right by failing to make a proper inquiry after the defendant requested that counsel be substituted. (*Bland, supra*, 20 F.3d at p. 1477.) Here, as previously discussed, the trial court immediately and properly inquired as to the adequacy of representation and potential existence of a conflict; accordingly, defendant's reliance on *Bland* is unavailing.

■ Defendant alleges that counsel's failure to file a motion for a change of venue constituted inadequate representation requiring substitution of counsel. Not so. Certainly defense counsel could have been more artful in explaining to defendant why he believed that filing a motion for change of venue would be unsuccessful. However, defense counsel's decision not to file a motion he believes will be futile does not " ' "substantially impair" . . . defendant's right to effective assistance of counsel.' " (*People v. Abilez, supra*, 41 Cal.4th at p. 488; see *People v. Memro* (1995) 11 Cal.4th 786, 834 [47

Cal.Rptr.2d 219, 905 P.2d 1305] ["The Sixth Amendment does not require counsel ' "to waste the court's time with futile or frivolous motions" ' [citation]."].)

Finally, defendant contends that even if a conflict did not exist prior to the *Marsden* hearing, a conflict arose at the hearing because trial counsel took an "adversary position." There is no evidence in the record that Bestard took such a position; to the contrary, defense counsel was given an opportunity to describe the scope of his representation at the *Marsden* hearing, and following defendant's response, the trial court reasonably concluded that no substitution of counsel was necessary. Because we conclude that defendant was not denied his Sixth Amendment right to counsel, reversal is not warranted.

## B. *Dismissal of Prospective Juror Following Contact with Prosecution Witness*

Kim Pinto, Nakatani's sister and a witness for the People, observed jury selection in which her coworker, F.K., was a prospective juror. The next day, Pinto approached F.K. at work and told him that defendant "killed my sister. And if that's not enough, after that, he killed someone else. That's my case. And we have been waiting for a year to get it." Pinto then told F.K. that he would likely be excused because he knew her. Prospective Juror F.K. informed the court later that evening of the conversation he had with Pinto. The court admonished Pinto for her communication with F.K., heard testimony from F.K. regarding his communication with Pinto, and excused F.K. Defendant did not object to F.K.'s excusal.[3] Defendant now claims that dismissing F.K. violated his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. We disagree.

By failing to object, defendant forfeited his claim that the trial court erred in excusing Prospective Juror F.K. for cause. (*People v. Holt* (1997) 15 Cal.4th 619, 658 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Assuming that defendant had preserved this claim on appeal, we conclude that the trial court did not err. A trial court may excuse a prospective juror for "[a]ctual bias," which is defined as "the existence of a state of mind on the part of the juror in

---

[3] Defense counsel initially expressed "concern" that "this particular juror had some positive answers on his questionnaire that were favorable to the defendant" and that he was "denied access to a juror . . . that may have been favorable to" defendant. The court replied that "the juror may be unfavorable" to defendant, and defense counsel stated, "I also agree, that's true, too." Defense counsel thereafter did not object, and the court excused Prospective Juror F.K. Defendant then requested a new panel of prospective jurors because of "the tampering with this particular jury." The court concluded that contact with one prospective juror did not amount to tampering and denied defendant's motion.

reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); see Pen. Code, § 1046 ["Trial juries for criminal actions are formed in the same manner as trial juries in civil actions."].) "The term 'actual bias' may include a state of mind resulting from a juror's actually being influenced by extraneous information about a party." (*People v. Nesler* (1997) 16 Cal.4th 561, 581 [66 Cal.Rptr.2d 454, 941 P.2d 87].) F.K. knew a witness in the case, Pinto, by sight because they worked in the same location. Pinto told F.K. that defendant had killed her sister and killed another person as well. The trial court did not abuse its discretion in concluding that F.K.'s business relationship with Pinto and Pinto's statement, would "prevent the juror from acting with entire impartiality." (Code Civ. Proc., § 225, subd. (b)(1)(C).)

Defendant argues that the trial court's excusal of Prospective Juror F.K. was improper because a trial court is obliged to conduct a hearing once a juror's competence is called into a question. (See *People v. Farnam* (2002) 28 Cal.4th 107, 140–141 [121 Cal.Rptr.2d 106, 47 P.3d 988] [when trial court is on notice that cause may exist to discharge a juror, the court must conduct a reasonable inquiry to determine if the juror should be discharged].) Here, the trial court conducted an inquiry after it was made aware of Pinto's contact with F.K., which consisted of hearing argument from defense counsel and the prosecutor as to how to proceed, questioning F.K. regarding the conversation he had with Pinto, and providing defense counsel and the prosecutor with an opportunity to question F.K. regarding his conversation with Pinto.

Defendant nonetheless asserts that the trial court erred by failing to ask the prospective juror whether he could remain impartial and unbiased following his encounter with Pinto, and by failing to remind the prospective juror of his obligation to follow the court's instructions and decide the case on the law and evidence alone. Defendant cites three cases, in which, unlike in the case at bar, the trial court learned of potential juror prejudice but either failed to conduct a hearing or conducted a woefully inadequate hearing to ascertain whether there was actual prejudice. (See *People v. Compton* (1971) 6 Cal.3d 55, 59–60 [98 Cal.Rptr. 217, 490 P.2d 537] [no hearing]; *People v. Chavez* (1991) 231 Cal.App.3d 1471, 1479 [283 Cal.Rptr. 71] [no hearing]; *People v. McNeal* (1979) 90 Cal.App.3d 830, 837–838 [153 Cal.Rptr. 706] [inadequate hearing consisting of brief inquiry of foreman and of juror, without adequate clarifying questions asked of juror].) Moreover, each of the three cases involved an impaneled jury, whereas the trial court in the present case excused Prospective Juror F.K. prior to final selection of a jury.

Unlike in the three cases upon which defendant relies, here the trial court conducted a thorough hearing. The trial court heard argument from counsel,

questioned Prospective Juror F.K., and permitted the parties to question F.K. prior to dismissing him. Defendant asserts that the trial court in *People v. Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742], "did it right" when it conducted an "extensive hearing" before discharging a juror. In *People v. Collins*, the trial court dismissed a juror after questioning her regarding her impartiality; here, the trial court conducted an even more extensive evaluation of the prospective juror's ability to serve by questioning him regarding his encounter with Pinto, permitting counsel to question him, and hearing argument from counsel. As defendant noted, the trial court in *People v. Collins* "did it right"; here, the trial court also "did it right" by conducting a more thorough inquiry than the one conducted in *People v. Collins*.

Defendant cites no authority that requires a trial court to ask a potential juror whether he or she could remain impartial and unbiased before excusing the potential juror for cause. The court permitted defense counsel to question Prospective Juror F.K., which gave defendant an opportunity to so inquire if he wished. The trial court properly could have concluded that F.K.'s business relationship with Pinto and her statement to F.K. established that F.K. was actually biased even had he assured the court he would attempt to be impartial. Accordingly, here, even if the trial court's exercise of its broad discretion to excuse a prospective juror was erroneous, which it was not, any such error does not warrant reversal.

### C. *Precluding Cross-examination of Kim Pinto*

Defendant argues that the trial court violated his Sixth Amendment right to confront witnesses and abused its discretion under Evidence Code section 352 by denying his motion to cross-examine Pinto regarding her conversation with Prospective Juror F.K. to establish her bias or prejudice against defendant. Defendant also sought to cross-examine Pinto in an effort to show that the district attorney engaged in discriminatory enforcement by prosecuting members of defendant's family for witness tampering, while failing "to pursue [Pinto] just as vigorously as [it] pursued" the members of defendant's family. The court denied defendant's motion, ruling that defendant could not use Pinto's conversation with a prospective juror "as a way to catapult some unrelated event to cloud the issues in this case."

■ We conclude that the trial court did not err by denying defendant's motion. While a defendant's confrontation right includes the right to cross-examine adverse witnesses regarding bias or prejudice, the right is not absolute. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 [66 Cal.Rptr.2d 609, 941 P.2d 788].) As the trial court did here, a court may restrict cross-examination based upon the factors articulated in Evidence Code section

352. (*People v. Quartermain, supra,* 16 Cal.4th at p. 623.) A trial court has the discretion to exclude otherwise admissible "evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

The trial court did not abuse its discretion by excluding evidence regarding Pinto's communications with a prospective juror. Defendant cross-examined Pinto regarding her relationship to Nakatani, her relationship to her nephew, and the ongoing custody battle between defendant's family and Nakatani's family over defendant's son. The subjects upon which Pinto was cross-examined amply demonstrated Pinto's potential bias against defendant. The trial court did not abuse its discretion by concluding that additional cross-examination regarding Pinto's conversation with a prospective juror would "cloud the issues" and further testimony was therefore inadmissible under Evidence Code section 352.

## D. *Spontaneous Statement*

The trial court granted the People's motion to introduce, over defendant's objections, the out-of-court statement of defendant's son implicating defendant in Nakatani's death. At trial, Pinto testified that while she and defendant's three-year-old son were driving to her mother's house on December 7, 1996, approximately two months following the death of Nakatani, Pinto told the child that they were going to the cemetery to visit his mother's grave. In response, defendant's son told Pinto, "I'm going to untie my mommy." Pinto asked the boy "who told him that," and he replied that "his daddy and his mean friend tied up his mommy." The child made a tying motion with his hands and pointed at his neck while making this statement. The boy stated that he hit defendant, told defendant to stop, and defendant carried him upstairs. While making his statement, the child was crying, and "scrunching up his face like he was angry."

Pinto testified that two days after the child made the statement regarding his mother, she reported it to Detective Aquino, and Detective Aquino interviewed her and the boy in person shortly thereafter. Detective Aquino testified at a hearing to determine whether the statement was admissible,[4] and corroborated Pinto's account that she called him to report the child's statement, and that he interviewed her in person a few weeks later. Defendant

---

[4] Evidence Code section 402 provides, in pertinent part, that "[t]he court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ."

objected that his son's statements were inadmissible hearsay; the trial court overruled defendant's objection, ruling that Pinto's statement was corroborated by Detective Aquino's recollection of the incident, and Pinto's testimony regarding defendant's son's hearsay statement fell "within the parameter of the [spontaneous declaration] exception of the hearsay rule" and was admissible.[5]

On appeal, defendant argues that the admission of the child's hearsay statement violated his right to a fair trial, his right to confront witnesses under the Sixth Amendment to the United States Constitution, as well as his right to due process pursuant to the Fourteenth Amendment to the United States Constitution. We note that although defendant did not raise federal constitutional objections to the admission of his son's testimony at trial, he did not forfeit those claims on appeal. Where "it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the Constitution[,] . . . defendant's new constitutional arguments are not forfeited on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*), applying *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1289, fn. 15 [82 Cal.Rptr.3d 265, 190 P.3d 616].)

■ A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and "[w]as made spontaneously while the declarant was under the stress of excitement caused by" witnessing the event. (Evid. Code, § 1240.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective

---

[5] Defendant made two other objections at trial, neither of which he raises on appeal. First, defendant objected that Pinto's testimony describing his son's interaction with Pinto's children prior to Nakatani's death lacked foundation because Pinto was not familiar with the boy's actions prior to his mother's death. The trial court overruled defendant's objection, and Pinto testified that she was familiar with defendant's son's behavior with her children both prior to and following Nakatani's death. Second, defendant objected that Pinto's description of the boy as appearing angry when describing what happened to Nakatani was speculative. The court overruled defendant's objection, concluding that Pinto's characterization of the boy's state of mind was admissible under Evidence Code section 800. Evidence Code section 800 provides, "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*).) Spontaneous statements are deemed sufficiently trustworthy to be admitted into evidence because " ' "in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief." ' [Citation.]" (*Ibid.*)

In *Poggi*, a police officer responding to a call found the victim about 30 minutes after she had been stabbed "in a very excited state, with blood flowing from her mouth . . . apparently attempting to recount what had happened to her but was rambling and incoherent." (*Poggi, supra,* 45 Cal.3d at p. 315.) In response to the officer's questioning, the victim described the crime while paramedics attempted to treat her wounds. (*Id.* at p. 316.) The victim later died from her injuries. (*Ibid.*) This court affirmed the trial court's ruling that the victim's statements were admissible as spontaneous statements, stating that "[w]hether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion . . . .' [Citation.]" (*Id.* at p. 318.)

The defendant in *Poggi* argued that the statements were not spontaneous because they were made about 30 minutes following the attack in response to questioning. We held the trial court did not abuse its discretion: "First, although [the victim] made the statements at issue about 30 minutes after the attack, it is undisputed that she was still under its influence. Second, it is also undisputed that she remained excited as she made the statements, even though she had become calm enough to speak coherently." (*Poggi, supra,* 45 Cal.3d at p. 319.) Thus, although the lapse of time between the underlying event and the statement describing it is relevant, a statement remains spontaneous " 'if it nevertheless appears that [the statement was] made under the stress of excitement and while the reflective powers were still in abeyance.' ([*People v. Washington* (1969)] 71 Cal.2d [1170,] 1176 [81 Cal.Rptr. 5, 459 P.2d 259] . . . .)" (*Poggi, supra,* 45 Cal.3d at p. 319, italics omitted.) The amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited.

Here, defendant argues that the child's statement did not satisfy the requirements of a spontaneous declaration because the child's ability to reflect and fabricate had returned by the time he made the statement, and the statement failed to describe the event immediately preceding it. We agree.

The word "spontaneous" as used in Evidence Code section 1240 means "actions undertaken without deliberation or reflection. . . . [T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker. (*People v. Farmer, supra,* 47 Cal.3d 888, 903.) "The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant." (*Id.* at pp. 903–904.) In *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1130 [200 Cal.Rptr. 789], the Court of Appeal held that the out-of-court statement of a three-year-old girl stating that her father had sexually abused her one to two months earlier was not admissible as a spontaneous statement because the victim was not "still 'under the stress of excitement caused by' the exciting event, in this case the acts of sexual abuse." (Fn. omitted, disapproved on other grounds in *People v. Brown* (2003) 31 Cal.4th 518 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) The court observed: "Frequently, statements are ruled inadmissible under this exception even though uttered only a few minutes after the exciting event. [Citations.] Substantially longer delays have been tolerated when the declarant was unconscious. [Citation.] Nonetheless, nothing in the cases or underlying theory of the 'spontaneous exclamation' exception would suggest the necessary level of psychological stress could be sustained for even a few hours to say nothing of the weeks and months involved in this case." (*In re Cheryl H., supra,* 153 Cal.App.3d at p. 1130, fn. omitted.)

The trial court relied on *People v. Trimble* (1992) 5 Cal.App.4th 1225 [7 Cal.Rptr.2d 450] (*Trimble*), to find that the boy's statement satisfied the spontaneous declaration exception to the hearsay rule. In *Trimble*, the victim was last seen alive shortly after her mother returned her to the cabin the mother shared with the defendant and their two children. (*Id.* at pp. 1228–1229.) Two days later, the victim's sister went to the cabin. (*Id.* at p. 1229.) As soon as the defendant left the cabin, the victim's two-and-one-half-year-old daughter "became 'completely hysterical' " and described to her aunt how her father had stabbed her mother nearly two days earlier. (*Ibid.*)

The Court of Appeal ruled that the trial court did not abuse its discretion in finding that the child's statements "were spontaneous rather than the product of reflection." (*Trimble, supra,* 5 Cal.App.4th at p. 1235.) The court concluded that despite "[t]he appreciable interval between the incident and the

subject statements," the arrival of the child's aunt and the departure of the child's father, with whom she had been sequestered for two days, "was a triggering event, startling enough to provoke an immediate, unsolicited, emotional outpouring of previously withheld emotions and utterances. [Citation.]" (*Ibid.*) The *Trimble* court relied upon the fact that, until the arrival of the child's aunt, the child "had no trustworthy person in whom to confide." (*Ibid.*)

*Trimble* is distinguishable from the present case. Here, defendant's son was dropped off with his great-grandparents less than one hour following his departure from Nakatani's home, but did not immediately make the statement at issue. He stayed with his father's family and visited his mother's family once every week or two following his mother's death. He was never confined with defendant and had ample opportunity to confide in a relative. Unlike in *Trimble*, the child did not make his statement at the "first secure opportunity for disclosure" following confinement with the assailant (*Trimble, supra,* 5 Cal.App.4th at p. 1235), but rather made his statement two months later when Pinto said she was taking him to visit his mother's grave. Although there was evidence the boy was upset, because he was crying and "scrunching up his face like he was angry," there is nothing to indicate that during the two-month period following his mother's murder he had remained under the stress of excitement caused by witnessing the event and that his reflective powers were still in abeyance. We therefore conclude that the trial court abused its discretion by admitting the child's hearsay statement.

■ Defendant alleges that the trial court's erroneous admission of the boy's hearsay statement violated his Sixth Amendment right to confront the witnesses against him. Not all erroneous admissions of hearsay violate the confrontation clause. (*People v. Page* (2008) 44 Cal.4th 1, 48 [79 Cal.Rptr.3d 4, 186 P.3d 395].) As the high court held in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354], "[t]he confrontation clause 'applies to "witnesses" against the accused—in other words, those who "bear testimony." [Citation.] "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." [Citation.]' " (*People v. Page, supra,* 44 Cal.4th at p. 48, quoting *Crawford, supra,* 541 U.S. at p. 51.) Only the admission of testimonial hearsay statements violates the confrontation clause—unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. (*People v. Geier* (2007) 41 Cal.4th 555, 597 [61 Cal.Rptr.3d 580, 161 P.3d 104].) While the high court declined to precisely define what constitutes a "testimonial" statement, it held that, at a minimum, testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." (*Crawford, supra,* 541 U.S. at p. 68.) The court explained that the confrontation clause addressed the specific concern of "[a]n accuser who

makes a formal statement to government officers" because that person "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* at p. 51.) The statement of a three-year-old declarant made to his aunt is more like "a casual remark to an acquaintance" and is therefore not a testimonial statement under *Crawford*. (See *People v. Griffin* (2004) 33 Cal.4th 536, 579, fn. 19 [15 Cal.Rptr.3d 743, 93 P.3d 344] [out-of-court statement made to a friend at school does not constitute "testimonial hearsay" under *Crawford*].) Thus, admission of the child's hearsay statement did not violate defendant's Sixth Amendment right to confront witnesses.

Defendant alleges that the trial court's erroneous admission of the boy's hearsay statement also violated his Fourteenth Amendment right to due process, but fails to provide authority for this proposition, other than his bare assertion that the statement lacked particularized guarantees of trustworthiness. Defendant also fails to explain how a statement's lack of trustworthiness violates the Fourteenth Amendment's due process guarantee. Defendant is unable to establish a federal constitutional violation; accordingly, we analyze the trial court's error under the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] to "evaluate whether 'it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.' " (*People v. Page, supra,* 44 Cal.4th at p. 42, quoting *People v. Watson, supra,* 46 Cal.2d at p. 836.)

Defendant argues that the child's hearsay statement was the only "testimony placing [defendant] inside Nakatani's apartment at the time of her death and as an active participant in her death." The People argue, on the other hand, that there was ample circumstantial evidence of defendant's guilt, including defendant's statement that he had to do what was best for his son, his threats to Nakatani's siblings that they would be "next," his story that he left Nakatani's home moments before her murder, and his attempts to falsify an alibi, all of which may have been believed by the jury. The People also argued that the jury could find defendant guilty as an aider and abettor, and the trial court so instructed the jury.

Although defendant is correct that the boy's testimony provided the only direct evidence implicating defendant in the murder, defendant fails to acknowledge the profuse circumstantial evidence of defendant's guilt. Absent the child's hearsay testimony, it is possible that a jury could have believed defendant's testimony regarding the event—that he went to Nakatani's home accompanied by two men whom he refused to identify, engaged in a brief altercation with Nakatani, and returned to the car with his son while his two unnamed cohorts quickly killed Nakatani unbeknownst to him—and found him innocent. However, we need not conclude that it is reasonably probable

that the jury would have returned a verdict more favorable to defendant absent the child's testimony because the jury did not find defendant guilty of first degree murder. Rather, the jury found defendant guilty of second degree murder as an aider and abettor, a nearly inescapable conclusion in light of the circumstantial evidence that defendant was in Nakatani's home moments before she was strangled, his jailhouse confessions that he had to do what was best for his son, and Pinto's testimony that he told her she had "better talk to [Nakatani] or else he will take care of her his way." Absent the child's testimony, it is more probable than not that the jury would have concluded—and did conclude—that defendant was guilty of second degree murder as an aider and abettor because defendant knew " ' "the full extent of the perpetrator's criminal purpose and [gave] aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [108 Cal.Rptr.2d 188, 24 P.3d 1210], quoting *People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Accordingly, we conclude that reversal of defendant's conviction is not warranted.

### E. *Failure to Instruct Regarding Evaluating Child Testimony*

Defendant contends the trial court erred by refusing his request to instruct the jury pursuant to CALJIC No. 2.20.1—which guides the jury in evaluating the testimony of a child 10 years of age or younger—because the instruction would have helped the jury evaluate the credibility of his son's statements introduced through Pinto's testimony.[6] Defendant first contends that because Evidence Code sections 1202 and 788 permit a party to introduce evidence to impeach a hearsay declarant's credibility, the trial court erred by refusing to give CALJIC No. 2.20.1 to allow the jury to assess the child's credibility as a hearsay declarant.

■ Defendant's reliance on Evidence Code sections 1202 and 788 is misplaced. While defendant correctly asserts that a jury may evaluate the credibility of a hearsay declarant, defendant offered no evidence—under Evidence Code sections 1202 (declarant's prior inconsistent statements), 788 (declarant's prior felony convictions), or otherwise—to impeach the declarant's credibility. It does not follow from the fact that a hearsay declarant's testimony may be impeached that the court here erred by refusing to instruct the jury pursuant to CALJIC No. 2.20.1, which assists the jury in

---

[6] CALJIC No. 2.20.1 provides: "In evaluating the testimony of a child [ten years of age or younger] you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. A child, because of age and level of cognitive development, may perform differently than an adult as a witness, but that does not mean that a child is any more or less believable than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child." (Original brackets.)

evaluating a child witness's performance on the witness stand. (See *People v. Jones* (1990) 51 Cal.3d 294, 315–316 [270 Cal.Rptr. 611, 792 P.2d 643] [addressing § 1127f's application to child witness testifying]; *People v. McCoy* (2005) 133 Cal.App.4th 974, 979–980 [35 Cal.Rptr.3d 366].)

Defendant also relies upon section 1127f, which requires, at the request of a party, that a trial court instruct the jury in language that has been incorporated into CALJIC No. 2.20.1 when "a child 10 years of age or younger *testifies as a witness*." (Italics added.) By its terms, section 1127f does not apply because the declarant was not called as a witness. CALJIC No. 2.20.1 is a specific instruction that addresses how a jury should evaluate the testimony of a child witness. Because the requested instruction was inapplicable, we conclude that the trial court did not err by refusing to instruct the jury pursuant to CALJIC No. 2.20.1.

Assuming for the purposes of argument that the court's refusal to instruct the jury pursuant to CALJIC No. 2.20.1 was erroneous, any error was harmless because the trial court adequately instructed the jury pursuant to CALJIC No. 2.20[7] regarding the jury's duty to evaluate the believability of witnesses and the truthfulness of testimony. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) CALJIC No. 2.20 allowed the jury to assess the believability of defendant's son's hearsay statement; CALJIC No. 2.20.1 would not have provided guidance to the jury beyond that provided by

---

[7] CALJIC No. 2.20 provides, "Every person who testifies under oath [or affirmation] is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

"In determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following:

"The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified;

"The ability of the witness to remember or to communicate any matter about which the witness has testified;

"The character and quality of that testimony;

"The demeanor and manner of the witness while testifying;

"The existence or nonexistence of a bias, interest, or other motive;

"The existence or nonexistence of any fact testified to by the witness;

"The attitude of the witness toward this action or toward the giving of testimony [.] [;]

"[A statement [previously] made by the witness that is [consistent] [or] [inconsistent] with [his] [her] testimony] [.] [;]

"[The character of the witness for honesty or truthfulness or their opposites] [;]

"[An admission by the witness of untruthfulness] [;]

"[The witness' prior conviction of a felony] [;]

"[Past criminal conduct of a witness amounting to a misdemeanor] [;]

"[Whether the witness is testifying under a grant of immunity]." (Original brackets.)

CALJIC No. 2.20, and may have confused the jury because the instruction pertained specifically to the instance of a young child's giving live testimony.

### F. *Seizure and Admission of Defendant's Correspondence*

Defendant contends that the trial court deprived him of his Sixth Amendment right to counsel by admitting into evidence documents seized from defendant's prison cell that were protected by the attorney-client privilege. We disagree.

As noted above, on December 15, 1997, as defendant was being moved out of the general prison population, Deputy Sheriff Thomas Garcia searched defendant's property and found a number of "kites," which are notes inmates illegally pass to one another or to individuals outside of the prison system. Deputy Sheriff Garcia did not "go into detail" in his search of defendant's property; once he discovered the contraband, he packed all of the notes into the folder in which he found them, and called his colleague to pick up the documents.

The prosecutor presented the documents to the trial court, and it conducted an in camera review of the seized documents, isolated all documents that appeared to fall within the attorney-client privilege, and sealed the remainder of the documents to protect witnesses. On January 15, 1998, defense counsel requested that all of the seized documents be turned over to him; the trial court denied the request, explaining that all documents protected by the attorney-client privilege would be returned, but the remainder of the documents would stay sealed "until 30 days prior to trial which the code would mandate and that's for the protection of the witnesses."

During the pendency of defendant's trial, the court found "there was a conspiracy directed by this defendant to contact, intimidate and dissuade witnesses relevant to the Mario Orrellana [*sic*] shooting." "The court's review of those documents [seized from defendant's cell] have convinced the court that [defendant] is not only a threat as he is in jail, but he is a . . . continuing threat to the witnesses in this case; that he has conducted a concerted effort to identify those witnesses, to pass the identity of those witnesses to other individuals for the purpose of intimidation or, in fact, the court is convinced to do them great harm and, in fact, potential threat of death to those witnesses. The court is equally convinced based upon the evidence that has been received and is under seal by the court that the defendant has been utilizing certain members of his family in that pursuit." At the time of defendant's trial, charges had been filed against defendant and others involved in the conspiracy to intimidate witnesses, but no convictions had occurred.

On the eve of trial, five months following the trial court's ruling that the documents seized from defendant's prison cell would remain sealed, defendant generally objected to the prosecutor's mention of the pending witness intimidation conspiracy case that had been filed against defendant and others. The prosecutor agreed to refrain from specifically mentioning that "a case has been filed," but explained that he would discuss the existence of a conspiracy, would introduce the kites into evidence, and would call witnesses to testify regarding the documents seized from defendant.

Three days following this agreement, defendant interrupted his cross-examination of Deputy Garcia to request a hearing regarding the documents, contending that they were covered by the attorney-client privilege. The court entertained defendant's motion, reviewed the documents, and concluded that none were protected by the attorney-client privilege. The court invited defendant to explain why any of the documents were privileged. Defendant declined to do so, and declined to continue his cross-examination of Deputy Garcia. Instead, defendant requested that his motion be "reserved" until defendant testified, but he did not raise the objection again.

■ " '[A] confidential communication between client and lawyer' " is protected by the attorney-client privilege and may not be disclosed without the consent of the client or the client's representative. (Evid. Code, § 952; see *id.*, §§ 953, 954.) Defendant claims that the documents, largely consisting of kites seized from his cell, were privileged because he intended to show the documents to his lawyer, or to the investigator working on his lawyer's behalf. This argument lacks merit, as the intent to show a document to a lawyer does not transform a document into one covered by the attorney-client privilege. (See *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1498 [66 Cal.Rptr.3d 833] ["The [attorney-client] privilege only protects disclosure of communications, it does not protect disclosure of the underlying facts by those who communicated with the attorney."].) An attorney-client privileged communication is defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client . . . ." (Evid. Code, § 952.) Thus, a client's intent to communicate with his or her lawyer does not render the subject of that communication privileged; the rule requires that "information [be] transmitted." (Evid. Code, § 952; see *Zurich American Ins. Co. v. Superior Court, supra*, 155 Cal.App.4th at p. 1498.)

We review a trial court's conclusion that a document is admissible and not subject to the attorney-client privilege to determine whether it is supported by substantial evidence. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1208 [40

Cal.Rptr.2d 456, 892 P.2d 1199].) "On appeal, the scope of judicial review is limited. 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations].' (*D.I. Chadbourne, Inc.* v. *Superior Court*[ (1964)] 60 Cal.2d [723,] 729 [36 Cal.Rptr. 468, 388 P.2d 700].)" (*People v. Gionis, supra,* 9 Cal.4th at p. 1208.)

The trial court twice concluded that the kites ultimately admitted into evidence contained no privileged materials. The trial court invited defendant to seek writ review of its initial ruling, which defendant declined to do. The trial court then considered and rejected defendant's contention that the documents were privileged, and invited defendant to point to a specific document that was privileged. Again, defendant declined the trial court's invitation, and "reserved" his objection, although he never again renewed it. By failing to press the court for a ruling, defendant forfeited this claim. (*People v. Richardson* (2008) 43 Cal.4th 959, 1017, fn. 20 [77 Cal.Rptr.3d 163, 183 P.3d 1146]; *People v. Lewis* (2008) 43 Cal.4th 415, 482 [75 Cal.Rptr.3d 588, 181 P.3d 947].) In light of the trial court's review of the documents and defendant's inability to articulate why any of the documents were privileged, we conclude that substantial evidence supports the trial court's conclusion that the documents are not protected by the attorney-client privilege.

### G. *Admission of Testimony Regarding Defendant's Gang Affiliation and Intent to Kill*

Defendant contends that the trial court violated his right to a fair trail by admitting the expert testimony of Deputy Sheriff Scott Lusk. Defendant argues that Deputy Lusk's testimony regarding defendant's affiliation with the Puente 13 gang was cumulative and unduly prejudicial, that his testimony regarding the notes found in defendant's cell was irrelevant and prejudicial, and that his testimony regarding prior crimes committed by the Puente 13 gang was irrelevant, prejudicial, and constituted improper propensity evidence. With one exception, defendant failed to object upon the grounds specified on appeal, and has therefore forfeited these claims.[8] (*People v. Partida, supra,* 37 Cal.4th at p. 438.) Even if defendant had properly objected to the introduction of Deputy Lusk's testimony, we conclude that the trial court did not abuse its discretion by admitting Deputy Lusk's testimony

---

[8] Defendant objected on grounds of relevance to Deputy Lusk's testimony regarding a 1990 attempted murder involving the Puente 13 gang. As addressed below, although this claim is not forfeited, we nonetheless reject defendant's argument that the trial court erred by admitting the testimony.

regarding defendant's affiliation with the Puente 13 gang, the gang's prior crimes, and the notes found in defendant's cell. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 898 [63 Cal.Rptr.3d 1, 162 P.3d 528] [trial court's evidentiary rulings reviewed for abuse of discretion].)

Deputy Lusk, an 18-year veteran of the Los Angeles County Sheriff's Department, testified as a gang expert that he had approximately nine years of experience as a gang detective with the Operation Safe Streets unit of the Los Angeles County Sheriff's Department Industry Station. Deputy Lusk testified that he had experience with the Puente 13 gang, with which defendant was affiliated, and he had had several dozen conversations with defendant over the eight-year period preceding defendant's trial. Deputy Lusk testified that defendant, known as "Dinky," was a member of the Perth clique of the Puente 13 gang, and that his tattoos affiliated him both with the gang and with the clique. Deputy Lusk testified that the Puente 13 gang's primary purpose was to commit crimes, and described the types of crimes committed by the gang, including an attempted murder in 1990 and a robbery in 1991. Neither crime involved defendant. Deputy Lusk testified that the crimes were committed to enhance the reputation of the Puente 13 gang, and to enhance the reputations of the gang members convicted of committing the crimes. Defendant failed to object to Deputy Lusk's testimony regarding defendant's affiliation with the Puente 13 gang, and objected only once, based upon relevance, to Deputy Lusk's testimony regarding the 1990 attempted murder.

Deputy Lusk also interpreted the kites found in defendant's jail cell. Deputy Lusk explained that the notes concerned individuals planning to testify in defendant's trial, and that one note in particular meant that an individual should be prevented from testifying using any means necessary, "from talking to—to the person all the way up to killing him, if necessary." Defendant twice objected during Deputy Lusk's testimony regarding the notes—arguing that the evidence was speculative and cumulative—but failed to object based on relevance, prejudice, or that the testimony constituted improper propensity evidence.

The trial court cautioned the jury that it was permitted to consider Deputy Lusk's testimony only in connection with the allegation that the murder of Orellano and attempted murder of Medina were committed for the benefit of the Puente 13 gang with the intent to promote or assist the gang pursuant to section 186.22. The trial court then asked, the jury, "Does everyone under-stand that?" The jurors answered collectively in the affirmative.

We conclude that the trial court did not abuse its discretion by admitting Deputy Lusk's testimony for its limited purpose. " 'A court abuses its discretion when it acts unreasonably under the circumstances of the particular

case.' " (*People v. Panah* (2005) 35 Cal.4th 395, 426 [25 Cal.Rptr.3d 672, 107 P.3d 790].) Here, the trial court could have reasonably concluded that evidence regarding defendant's affiliation with the Puente 13 gang, the gang's prior criminal activities, and the notes found in defendant's cell were relevant with respect to the gang enhancement allegation, and were not unduly prejudicial or cumulative because the evidence related only to the enhancement allegation and not the underlying charged crimes.

 Punishment for a crime may be enhanced when the crime is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(4); see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1044 [16 Cal.Rptr.3d 880, 94 P.3d 1080].) To establish a gang enhancement, a prosecutor must prove facts beyond the elements of the underlying offense. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1044.) "Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited to the charged offense." (*Ibid.*) To prove the gang enhancement, the prosecution may introduce expert testimony regarding street gangs. (*Id.* at pp. 1047–1048.)

Here, the trial court admitted Deputy Lusk's testimony about defendant's affiliation with the Puente 13 gang, and regarding the notes found in defendant's cell. This evidence related directly to the elements of the gang enhancement pursuant to section 186.22, subdivision (b)(4). The evidence demonstrated that defendant was a member of the Perth clique of the Puente 13 gang, the primary purpose of which was to commit crimes. Deputy Lusk testified to the violent nature of the Puente 13 gang by describing the types of crimes committed by the gang. This evidence was admissible to prove facts—such as the violent nature of the gang with which defendant was affiliated, and the types of crimes committed by gang members—related to the gang enhancement, even if the evidence was inadmissible to prove the underlying charged offense. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1044.) We conclude that the trial court did not err in admitting Deputy Lusk's testimony, particularly in light of the limiting instruction that the testimony was being offered only with respect to the gang enhancement allegation, and was not offered to prove the underlying charged offenses.

## H. *Defendant's Alleged Inability to Fully Testify*

Defendant argues that the trial court made a number of confusing rulings concerning the extent to which defendant would be permitted to testify about his relationship with Nakatani, ultimately impairing defendant's ability to fully testify as to the events leading to Nakatani's death. Defendant's

characterization of the trial court's rulings is hyperbolic, and defendant concedes that he was not "literally" denied his right to fully testify. Accordingly, we conclude that the trial court did not err by limiting defendant's testimony regarding the specific details of his past physical altercations with Nakatani.

Defendant asserts that the trial court's rulings on the permissible scope of defendant's testimony regarding his relationship with Nakatani were misleading. We disagree. When defendant indicated his intention to introduce Nakatani's prior conviction for misdemeanor battery, the court ordered defendant not to comment on that conviction. When defense counsel attempted to elicit testimony describing an altercation that occurred between defendant and Nakatani, the court ruled that defendant could not testify as to "the details surrounding . . . [each] instance of violence between" defendant and Nakatani. Defense counsel stated that he understood the court's admonition, conferred briefly with defendant, and continued his direct examination of defendant until the end of the day.

The next morning, defense counsel resumed his direct examination of defendant, and defendant began to give more detailed answers to counsel's questions about the events of October 1, 1996, the date of Nakatani's death. Unprovoked, defendant stated that he "didn't go [*sic*] any further detail yesterday because I didn't understand the judge's earlier ruling." The court sustained the prosecutor's objection to defendant's statement, and defense counsel completed defendant's direct examination. The prosecution cross-examined defendant regarding his inconsistent testimony, pointing out that defendant provided a much greater level of detail on his second day of testifying compared to his first day.

During defendant's redirect examination, he explained that he had not provided significant detail during his first day of testimony because he had been "unclear on what [he] could testify to and what [he] couldn't on the judge's ruling." The court clarified that "[t]here [was] no such ruling," and requested that counsel provide a stipulation to that effect. After a brief sidebar discussion, the court clarified for the jury that its earlier statement that "[t]here [was] no such ruling" "was overly broad, and the parties have reached a stipulation which would be more precise on that issue." The parties then stipulated "that the defendant was not instructed that he could not talk about the conduct between himself and Nakatani which occurred on October 1st of 1996." Defendant thereafter completed his testimony.

■ As defendant argues, the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee that an accused has the right to testify on his or her own behalf. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51–53

[97 L.Ed.2d 37, 107 S.Ct. 2704].) As the high court has held, however, "the right to present relevant testimony is not without limitation." (*Id.* at p. 55.) So long as the restrictions placed on a defendant's right to testify are not "arbitrary or disproportionate to the purposes they are designed to serve," a court may apply a rule of evidence to limit a defendant's testimony if "the interests served by [the] rule justify the limitation imposed on the defendant's constitutional right to testify." (*Id.* at p. 56.) Here, the restriction placed on defendant's testimony—that he could not testify about the specific details of past altercations in which he and Nakatani were engaged, but could testify about their contentious relationship, and could provide specific details of the altercation that occurred on October 1, 1996—did not impinge on defendant's constitutionally protected right to testify on his own behalf. Defendant was able to fully testify regarding the altercation that occurred prior to Nakatani's death, and was able to explain that he and Nakatani had been involved in a tumultuous relationship. Indeed, defendant acknowledges that his right to testify on his own behalf was not impaired, stating that "the trial court's rulings did not, in a literal sense, deny [defendant] his fundamental right to take the stand and testify on his own behalf." Accordingly, we conclude that defendant's right to testify on his own behalf was not violated, and the trial court did not err by limiting the scope of defendant's testimony.

## I. *Trial Court's Alleged Disparagement of Defendant in Front of Jury*

As described, *ante*, defendant testified on redirect examination that he had not discussed the events of October 1, 1996, in detail during his first day of testimony because he was "unclear on what [he] could testify to and what [he] couldn't on the judge's ruling." The court stated, "[t]here [was] no such ruling, sir" and requested that counsel provide a stipulation to that effect. After a brief sidebar discussion, the court clarified for the jury that its earlier statement "was overly broad, and the parties have reached a stipulation which would be more precise on that issue." The parties then stipulated "that the defendant was not instructed that he could not talk about the conduct between himself and Nakatani which occurred on October 1st of 1996." Defendant contends that the court's statement, "[t]here [was] no such ruling, sir," constituted an impermissible comment on the evidence and disparaged defendant, violating defendant's rights to a fair trial and due process.

 Article VI, section 10 of the California Constitution provides that "[t]he court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." A judge's ability to comment upon evidence or a witness's credibility "is not unlimited. [Citations.] He may not withdraw material evidence from the jury's consideration or distort the testimony, and his comments should be temperately and fairly made, rather than being

argumentative or contentious to a degree amounting to partisan advocacy. . . . [T]he judge should make clear that his views are not binding but advisory only." (*People v. Friend* (1958) 50 Cal.2d 570, 577–578 [327 P.2d 97] (*Friend*), overruled on other grounds in *People v. Cook* (1983) 33 Cal.3d 400, 413, fn. 13 [189 Cal.Rptr. 159, 658 P.2d 86], overruled on other grounds in *People v. Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].) Here, the court's comment clarified its prior ruling, or lack thereof, and did not relate to the evidence or to defendant's credibility. Accordingly, the court's comment could not have run afoul of the rule prohibiting overly partisan judicial commentary because the court's statement only clarified its prior ruling, and did not address declarant's credibility.

Even if the court's comment may be construed as a comment upon defendant's credibility, we cannot agree with defendant that the judge's isolated comment was "contentious to a degree amounting to partisan advocacy." (*Friend, supra*, 50 Cal.2d at p. 577.) The judge stated that he made no ruling limiting defendant's testimony. Moments later, the judge clarified his statement for the jury, acknowledging that it was overbroad. The parties then stipulated as to the scope of the court's ruling regarding defendant's testimony. Although the judge's comment may have been borne of some frustration with defendant's repeated attempts to blame the court for his inconsistent testimony, that factor alone does not militate in favor of concluding that the court's comment deprived defendant of his rights to due process and a fair trial. (See *People v. Rodriguez, supra*, 42 Cal.3d at p. 770.) "Of course, appellate courts . . . must evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury." (*Ibid.*) Here, the jury was able to consider defendant's testimony in light of a clear ruling by the court, as reflected by the parties' stipulation. Accordingly, the court's comment addressing its earlier ruling, particularly when considered with its almost immediate admonition and clarification to the jury, did not deprive defendant of his right to due process or to a jury trial.

### J. *Failure to Instruct Regarding Third Party Culpability*

Defendant testified that after he left Nakatani's house with his son, the two unnamed individuals who went with him to Nakatani's home remained in her home for a minute or two. Once the two individuals returned to the car where defendant was waiting, defendant asked them what happened and they responded, "She got crazy with us." After defendant asked what that meant, the two individuals told him that they did not want to talk about it in front of defendant's son. After dropping off defendant's son, defendant again asked the two individuals what happened. Defendant testified that the two individuals replied that "she got crazy with them and they f. . .ed her up." Defendant

asked what they meant, and they replied, "Don't worry about it." Defendant testified that he "wanted to know [what happened] but they didn't want to say." Defendant did not request that the jury be instructed regarding third party culpability, and now claims that the court erred by failing to instruct the jury sua sponte regarding third party culpability. We have previously considered and rejected similar claims, and do so here.

 "The applicable principles are clear. A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it. (*People v. Robinson* (2005) 37 Cal.4th 592, 625 [36 Cal.Rptr.3d 760, 124 P.3d 363].) A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' (*People v. Holt, supra,* 15 Cal.4th at p. 688.) Finally, a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669 [21 Cal.Rptr.3d 612, 101 P.3d 509].)" (*People v. Abilez, supra,* 41 Cal.4th at p. 517, italics omitted.) Defendant contends that the court erred by failing to give a pinpoint instruction along with the burden of proof instruction, arguing that CALJIC No. 2.90 does not adequately inform the jury regarding the burden of proof for a defendant's affirmative defenses.

 As an initial matter, defendant bore the burden of requesting a pinpoint instruction, and failed to do so. (See *People v. San Nicolas, supra,* 34 Cal.4th at p. 669.) A defendant is entitled to a pinpoint instruction, upon request, only when appropriate. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) "Such instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*Ibid.,* citing *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247]; see also *People v. San Nicolas, supra,* 34 Cal.4th at p. 669.) We conclude that the court did not err by failing to instruct the jury, sua sponte, regarding third party culpability.

Here, the jury was instructed, pursuant to CALJIC No. 2.90, that a criminal defendant is presumed innocent, that he is entitled to a verdict of not guilty if the jury has reasonable doubt regarding his guilt, and that the prosecution bears

the burden of proving a defendant guilty beyond a reasonable doubt.[9] Because the jury was properly instructed as to these issues, and because the jury could have acquitted defendant had it believed that a third party was responsible for Nakatani's death, no third party culpability instruction was necessary. (*People v. Saille, supra*, 54 Cal.3d at p. 1119.)

Assuming for the purposes of argument that the trial court erred, any such error was harmless. The jury was instructed on reasonable doubt and burden of proof, and could have acquitted defendant had it believed defendant's testimony that his two unnamed cohorts were responsible for Nakatani's death. Had the court instructed the jury sua sponte regarding third party culpability, there is no reasonable probability that the result would have been different in light of the other instructions provided to the jury. (*People v. Abilez, supra*, 41 Cal.4th at pp. 517–518.) Thus, any error was harmless.

### K. *Failure to Instruct That Manslaughter Is a Lesser Included Offense of Murder*

■ Defendant claims that the trial court erred by denying his request to instruct the jury on the lesser included offense of voluntary manslaughter. Voluntary manslaughter is defined as "the unlawful killing of a human being without malice . . . [¶] . . . upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Because there was not substantial evidence that defendant committed voluntary manslaughter, we conclude that the trial court did not err by refusing to give a voluntary manslaughter instruction.

■ During argument regarding the exclusion of Nakatani's battery conviction, the court commented that defendant's testimony about the events preceding Nakatani's death did not warrant an instruction on the lesser included offense of voluntary manslaughter under *People v. Barton* (1995) 12 Cal.4th 186, 196, footnote 5 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*). Footnote 5 of *Barton* provides: "A trial court need not, however, instruct on lesser included offenses when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime (for example, when the

---

[9] In its entirety, CALJIC No. 2.90 provides: "Presumption of Innocence—Reasonable Doubt—Burden of Proof

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt.

"Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (Original brackets.)

only issue at trial is the defendant's identity as the perpetrator). Because in such a case 'there is no evidence that the offense was less than that charged' ([*People v.*] *Sedeno* [(1974)] 10 Cal.3d [703,] 715 [112 Cal.Rptr. 1, 518 P.2d 913]), the jury need not be instructed on any lesser included offense." (*Ibid.*) Defense counsel disagreed with the court, but did not pursue the matter. After the defense rested, defense counsel requested a manslaughter instruction, and the trial court denied the request, explaining that, consistent with footnote 5 of *Barton*, because defendant's defense was that "he didn't do it," the court was precluded from instructing on the lesser included offense of voluntary manslaughter.

Defendant properly asserts that it is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed." (*Barton, supra,* 12 Cal.4th at p. 190.) In *Barton*, the defendant and the victim were engaged in a heated argument; the defendant drew a gun believing that the victim was holding a knife, screamed at the victim, and ultimately shot the victim. (*Id.* at pp. 191–192.) It was uncontroverted that the defendant killed the victim; the issue was whether the trial court erred by instructing the jury on manslaughter over the defendant's objections where the defendant maintained the shooting was accidental. (*Id.* at p. 190.) We concluded that the trial court did not err, but explained in a footnote that a trial court need not instruct the jury on a lesser included offense where no evidence supports a finding that the offense was anything less than the crime charged. (*Id.* at p. 196, fn. 5; see *People v. Breverman* (1998) 19 Cal.4th 142, 149 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; *People v. Anderson* (1983) 144 Cal.App.3d 55, 61 [192 Cal.Rptr. 409].)

In the present case, unlike in *Barton*, defendant's identity as the killer was contested, because he denied killing the victim, specifically maintaining that his unnamed companions committed the murder. Further, a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [36 Cal.Rptr.3d 340, 123 P.3d 614].) "The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 60 [82 Cal.Rptr.2d 625, 971 P.2d 1001].) Here, no evidence was introduced that defendant was so inflamed that he killed the victim in a heat of passion. Defendant testified that he and Nakatani engaged in a verbal argument prior

to his taking his son and leaving Nakatani's house. Defendant testified that he told Nakatani, "[g]et off me, you f. . .ing bitch," and that she "cuss[ed] back at" him. We have held that calling the defendant "a 'mother f. . .er' and . . . repeatedly asserting that if defendant had a weapon, he should take it out and use it . . . plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment." (*People v. Manriquez, supra,* 37 Cal.4th at p. 586.) Similarly, the verbal exchange described by defendant in the present case did not constitute sufficient provocation for voluntary manslaughter.

Defendant also testified that Nakatani scratched his chest, he kicked her, she kicked him in the leg and grabbed his shirt, and he pulled away. Simple assault, such as the tussle defendant described, also does not rise to the level of provocation necessary to support a voluntary manslaughter instruction. (See *People v. Elmore* (1914) 167 Cal. 205, 211 [138 P. 989].) Indeed, rather than causing defendant to become enraged, defendant testified that he simply walked away. Accordingly, we conclude that the trial court did not err by refusing to give a voluntary manslaughter instruction, because that instruction was not supported by the evidence.

## L. *Exclusion of Nakatani's Prior Battery Conviction*

Defendant contends that the trial court erroneously excluded evidence regarding Nakatani's prior battery conviction. The trial court concluded that, because defendant's only defense was an alibi, any evidence of Nakatani's misdemeanor battery conviction was irrelevant. We review a trial court's exclusion of evidence for abuse of discretion, and we conclude that the trial court did not abuse its discretion here by excluding evidence of the victim's misdemeanor battery conviction, an event entirely unrelated to defendant. (*People v. Avila* (2006) 38 Cal.4th 491, 578 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

Defendant argues that evidence of Nakatani's conviction of misdemeanor battery was relevant and admissible to demonstrate her propensity for violence. Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." Evidence Code section 1103, subdivision (a)(1) provides an exception to Evidence Code section 1101, subdivision (a) when a defendant offers evidence regarding the character or trait of a victim "to prove conduct of the victim in conformity with the character or trait of character." Of course, the trial court may exclude otherwise admissible evidence pursuant to

Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative. (See *People v. Hoyos, supra*, 41 Cal.4th at p. 912; *People v. Wright* (1985) 39 Cal.3d 576, 587–588 [217 Cal.Rptr. 212, 703 P.2d 1106].) The trial court must always perform its gatekeeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant.

As defendant argues, "[w]here . . . a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].) Where no evidence is presented that the victim posed a threat to the defendant, exclusion of evidence regarding the victim's propensity for violence is proper. (*People v. Hoyos, supra*, 41 Cal.4th at p. 913.) Defendant suggests that the victim's propensity for violence was relevant to show that he was engaged in mutual combat with the victim and committed voluntary manslaughter rather than murder because he killed her in the heat of passion. As explained, *ante*, the quarrel with the victim described by defendant did not rise to the level of provocation necessary to support a voluntary manslaughter instruction. (See *People v. Manriquez, supra*, 37 Cal.4th at p. 586.) Thus, the trial court did not err by excluding as irrelevant evidence of Nakatani's misdemeanor battery conviction.

Assuming for purposes of this discussion that the trial court erred in excluding evidence of Nakatani's battery conviction, any such error was harmless because it would not have resulted in a more favorable verdict. (*People v. Watson, supra*, 46 Cal.2d at p. 837; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1213 [249 Cal.Rptr. 71, 756 P.2d 795].) Defendant was permitted to testify regarding his past fights with the victim and about the tumultuous nature of their relationship. Defendant was also allowed to describe the details of the altercation that occurred between defendant and the victim on the day she was killed. There is no reasonable probability that defendant would have obtained a more favorable outcome had he been permitted to introduce evidence of Nakatani's prior misdemeanor battery conviction. (*People v. Bunyard, supra*, 45 Cal.3d at p. 1213.)

### M. *Cumulative Guilt Phase Error*

Defendant contends that if we do not conclude that any individual guilt phase error mandates reversal, the cumulative effect of the guilt phase errors requires reversal. We disagree. To the extent that there are a few instances in which we found or assumed the existence of error, we concluded that no

prejudice resulted from any such error. Accordingly, the cumulative nature of the guilt phase errors, if any, does not lead us to conclude that defendant was denied a fair trial.

## PENALTY PHASE

### A. Failure to Instruct Regarding Unanimity on Aggravating Factors

Defendant argues that his Sixth, Eighth, and Fourteenth Amendment rights were violated by the trial court's erroneous refusal to instruct the jury that it must unanimously find true any particular aggravating factor. Defendant acknowledges that we have repeatedly considered and rejected similar claims, but urges us to reexamine our prior holdings in light of the high court's nearly 30-year-old decision in *Brown v. Louisiana* (1980) 447 U.S. 323 [65 L.Ed.2d 159, 100 S.Ct. 2214], cited for the proposition that a six-person jury must be unanimous to ensure its reliability.[10] Defendant also argues that the high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] compel us to conclude that juror unanimity as to each aggravating factor is constitutionally mandated.

We see no reason to disturb our consistent conclusion that juror unanimity regarding aggravating factors is not required prior to imposing the death penalty. (*People v. Wilson* (2008) 43 Cal.4th 1, 31 [73 Cal.Rptr.3d 620, 178 P.3d 1113].) We have also repeatedly considered and rejected defendant's argument that the high court's decisions in *Apprendi* and *Ring* compel a different conclusion. (*People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2].)

### B. Death Penalty Overbreadth

Defendant argues that the California death penalty statutory scheme violates the Eighth and Fourteenth Amendments to the United States Constitution because it permits arbitrary application of the death penalty and fails to narrow the class of persons eligible for the death penalty. Defendant acknowledges that we have repeatedly rejected such claims, and provides no persuasive reason for us to do otherwise here. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

---

[10] Defendant's reference to *Brown v. Louisiana* is misplaced. Defendant cites *Brown v. Louisiana* for the proposition that, at a minimum, the Sixth Amendment requires that a six-person jury unanimously decide the guilt or innocence of an individual accused of a nonpetty criminal offense in order to assure the jury's reliability. In fact, the high court so held in *Burch v. Louisiana* (1979) 441 U.S. 130, 139 [60 L.Ed.2d 96, 99 S.Ct. 1623]. In *Brown v. Louisiana*, the high court concluded that the rule articulated in *Burch* must be retroactively applied. (*Brown v. Louisiana, supra*, 447 U.S. at p. 336.)

## C. *Section 190.2*

Defendant argues that his sentence is invalid because section 190.2, setting forth the special circumstances permitting imposition of the death penalty, is overbroad in violation of the Eighth and Fourteenth Amendments. We have repeatedly rejected this claim, and defendant presents no argument warranting a different conclusion here. (*People v. Stevens* (2007) 41 Cal.4th 182, 211 [59 Cal.Rptr.3d 196, 158 P.3d 763] (*Stevens*).)

## D. *Section 190.3, Factor (a)*

Defendant argues that section 190.3, factor (a), "as applied," violates the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. Although defendant frames his argument as an "as applied" challenge, defendant's argument appears to be a facial challenge, focusing on the variety of circumstances courts have considered aggravating. The high court rejected a facial challenge to section 190.3, factor (a) in *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630], and we have repeatedly held that section 190.3, factor (a) "does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendments" to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Stevens*, *supra*, 41 Cal.4th at p. 212.)

## E. *Miscellaneous Constitutional Challenges to the Death Penalty Statute*

Defendant raises a number of challenges to California's death penalty statutory scheme, arguing that it lacks sufficient safeguards to avoid arbitrary and capricious imposition of the death penalty and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution. We have repeatedly considered and rejected these claims, and we see no reason to disturb our prior holdings here.

"[T]here is no constitutional requirement that the trial court instruct the jury that it must find beyond a reasonable doubt that aggravating circumstances exist, that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate penalty." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 533.) Moreover, the trial court should not instruct the jury as to the burden of proof at the penalty phase (*ibid.*), and failure to do so does not violate a defendant's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments. (*People v. Lewis*, *supra*, 43 Cal.4th at

pp. 533–534.) The high court's decisions in *Apprendi* and *Ring* do not compel us to conclude that the death penalty sentencing scheme violates due process because capital juries need not find aggravating factors beyond a reasonable doubt. (See *People v. Mendoza, supra,* 42 Cal.4th at p. 707.)

We have repeatedly held that "the death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish the standard of proof—for finding the existence of an aggravating factor . . . ." (*People v. Wilson, supra,* 43 Cal.4th at p. 31.) Accordingly, the trial court did not err by instructing the jury to consider the aggravating and mitigating circumstances without addressing the burden of proof. We have also repeatedly held that the death penalty statutory scheme is not unconstitutional for failing to require that aggravating factors outweigh mitigating factors, or for failing to establish a standard of proof for concluding that death is the appropriate sentence. (*Ibid.*) We again conclude that the jury need not base a death sentence upon written findings regarding aggravating factors. (*Id.* at p. 32.) Finally, defendant contends that the death penalty statutory scheme denies defendant equal protection of the laws, and urges us to reconsider our decision in *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115], holding otherwise. We have consistently held that the death penalty scheme does not violate a defendant's right to equal protection of the laws, and see no reason to conclude otherwise here. (*People v. Zamudio* (2008) 43 Cal.4th 327, 373 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

### F. *CALJIC No. 8.85*

Defendant raises several challenges to CALJIC No. 8.85, all of which we have previously considered and rejected. Defendant reiterates his argument that section 190.3, factor (a) is unconstitutionally overbroad. As discussed, *ante,* the high court rejected this claim in *Tuilaepa v. California, supra,* 512 U.S. at pages 975–976, and we have repeatedly held that section 190.3, factor (a) "does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments" to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Stevens, supra,* 41 Cal.4th at p. 212.) Defendant urges us to reconsider our holding that the trial court is not required to instruct the jury sua sponte that it may not "double count" circumstances of the crime as special circumstances; we see no reason to do so. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 188 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

Defendant argues that CALJIC No. 8.85 was defective because the jury was not instructed that section 190.2, factors (d) and (h) could only be

considered in mitigation. We have held that trial courts are under no obligation to so instruct, and that failing to instruct that section 190.2, factors (d) and (h) may only be considered in mitigation is not error. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Finally, defendant claims that the trial court erred by failing to clarify which of the enumerated factors in CALJIC No. 8.85 are aggravating and which are mitigating. As we have previously held, trial courts need not instruct the jury as to which factors are aggravating and which are mitigating, and failure to do so does not constitute error. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1069 [71 Cal.Rptr.3d 675, 175 P.3d 632].)

### G. *CALJIC No. 8.88*

Defendant argues that the trial court violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and his corresponding state constitutional rights by instructing the jury pursuant to CALJIC No. 8.88.[11] Defendant raises several specific challenges to CALJIC No. 8.88, all of which we have previously considered and rejected. First, defendant contends that CALJIC No. 8.88's use of the phrase "so substantial" impermissibly reduces the burden of proof necessary to impose the death penalty. We have repeatedly rejected this contention.

---

[11] CALJIC No. 8.88, as given to the jury, states, in pertinent part, "Penalty Trial—Concluding Instruction

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

"You shall now retire to deliberate on the penalty. The foreperson previously selected may preside over your deliberations or you may choose a new foreperson. In order to make a determination as to the penalty, all twelve jurors must agree."

(*People v. Wilson, supra,* 43 Cal.4th at pp. 31–32.) Defendant next argues that CALJIC No. 8.88 improperly explains the weighing process a jury is required to perform; its use of the word "totality" conveys that a jury may not decide against the death penalty unless it finds that the mitigating factors outweigh the aggravating factors; and it is defectively "death-oriented" because it fails to define or describe the penalty of life without the possibility of parole. We have repeatedly rejected these arguments and find no reason to hold otherwise here. (*People v. Dickey* (2005) 35 Cal.4th 884, 929 [28 Cal.Rptr.3d 647, 111 P.3d 921].)

## H. *Presumption of Life*

Defendant argues that the trial court erred by failing to instruct the jury regarding the "presumption of life." Defendant acknowledges that we considered and rejected a similar claim in *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980], and defendant presents us with no persuasive reason to revisit our holding here. (See *People v. Wilson, supra,* 43 Cal.4th at p. 31.)

## I. *Intercase Proportionality Review*

Defendant argues that lack of intercase proportionality review for death penalty cases violates the California and federal Constitutions; we have repeatedly held otherwise. (*People v. Mendoza, supra,* 42 Cal.4th at p. 706.)

## J. *Prosecutorial Discretion*

Defendant acknowledges that we have repeatedly rejected the claim that prosecutorial discretion to seek the death penalty violates the Fifth, Eighth, and Fourteenth Amendments. (*People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887].) We see no reason to revisit that conclusion here. (See *People v. Rundle* (2008) 43 Cal.4th 76, 199 [74 Cal.Rptr.3d 454, 180 P.3d 224].)

## K. *Method of Execution*

Defendant contends that the method of execution in California violates the Fourteenth Amendment's guarantee of due process and the Eighth Amendment's prohibition of cruel and unusual punishment. Specifically, defendant claims that the Department of Corrections and Rehabilitation's failure to adopt procedures consistent with section 3604 and the

Administrative Procedure Act violates defendant's right to procedural due process under the Fourteenth Amendment, and that lethal injection procedures violate the Eighth Amendment's prohibition of cruel and unusual punishment. We have repeatedly held that such "claims are not cognizable on appeal because they do not affect the validity of the judgment itself and do not provide a basis for reversal of the judgment on appeal." (*People v. Tafoya*, *supra*, 42 Cal.4th at p. 199; see also *People v. Ramirez* (2006) 39 Cal.4th 398, 479 [46 Cal.Rptr.3d 677, 139 P.3d 64].)

### L. *International Law*

Defendant contends that California's use of capital punishment "as regular punishment for substantial numbers of crimes" instead of as extraordinary punishment for extraordinary crimes is contrary to international norms of human decency. We have repeatedly rejected this claim, concluding that " 'California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. [Citations.]' " (*People v. Brasure*, *supra*, 42 Cal.4th 1037, 1072, quoting *People v. Demetrulias*, *supra*, 39 Cal.4th at pp. 43–44; see also *People v. Leonard* (2007) 40 Cal.4th 1370, 1430 [58 Cal.Rptr.3d 368, 157 P.3d 973].)

Defendant also alleges that he was denied his right to a fair trial under various international treaties. Because we conclude that defendant's trial was conducted in accordance with state and federal constitutional law, we need not consider whether a violation of state or federal constitutional law would also constitute a violation of international law. (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 511.)

### M. *Cumulative Error*

As with defendant's guilt phase cumulative error claim, defendant contends that if we do not conclude that any individual penalty phase error mandates reversal, the cumulative effect of the penalty phase errors requires reversal. We disagree. We found no penalty phase error, but assuming there was any error, no prejudice resulted. Accordingly, the cumulative nature of the penalty phase errors, if any, do not convince us that defendant was denied a fair trial.

### III. Conclusion

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 1, 2009.