Filed 2/26/26  P. v. Machleit CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KIMBERLY LYNN MACHLEIT,<br><br>    Defendant and Appellant. | 2d Crim. No. B335082<br>(Super. Ct. No. 20CR06771)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 3, 2026, be modified as follows:

1.  On page 3, the third sentence of the fourth full paragraph, commencing with "On one occasion," is deleted.  In its place the following sentence is inserted:

On occasion he would scream, "You're all going to die."

2.  On page 4, the first sentence of the second full paragraph, commencing with "Machleit told Anderson," is deleted.  In its place the following two sentences are inserted:

Machleit told Anderson about a threat that Govey made at the end of November which allegedly involved stabbing Anderson. In response, Anderson started carrying a firearm with him.

3. On page 6, the last sentence of the third full paragraph, commencing with "He also testified," is deleted. In its place the following sentence is inserted:

He also testified that Anderson pocketed the firearm, but could not say whether Govey was still holding the knife.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
YEGAN, Acting P. J.      BALTODANO, J.      KELLEY, J.*

_____

* Judge of the San Luis Obispo Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

Filed 2/3/26  P. v. Machleit CA2/6 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B335082 |
| Plaintiff and Respondent, | (Super. Ct. No. 20CR06771) (Santa Barbara County) |
| v. | |
| KIMBERLY LYNN MACHLEIT, | |
| Defendant and Appellant. | |

Kimberly Lynn Machleit appeals the judgment after a jury convicted her of murder in the first degree (Pen. Code,[1] §§ 187, subd. (a); 189, subd. (a)).  The jury also found true, the allegation that Machleit personally discharged a firearm causing death within the meaning of section 12022.53, subdivision (d).  The trial court sentenced Machleit to 25 years to life for the murder.  The court also imposed an additional 10 years pursuant to section

_____

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

12022.53, subdivision (b) for the firearm enhancement, and struck the section 12022.53, subdivision (d) enhancement.

Machleit was prosecuted for the December 3, 2018, shooting of Joseph Govey in the kitchen of a home they shared. Govey was an acknowledged gang member and he was arguing with Donald Anderson, another gang member and Machleit's boyfriend, when she retrieved a shotgun she had hidden in the attic, returned to the kitchen and shot Govey in the head. Machleit's only defense at trial was that she acted in self-defense or in defense of Anderson. In support of that defense, she presented extensive evidence of Govey's violent conduct towards her and other residents of the homes they shared. Machleit was also permitted to introduce evidence of Govey's long history of violence and his affiliations with violent gangs.

Machleit asserts four errors. She contends the trial court erred in precluding evidence that the prison gang Govey belonged to was the Aryan Brotherhood (AB). She also contends the trial court erred in refusing a pinpoint jury instruction she offered to supplement CALCRIM 352 regarding evidence of a victim's violent character. She also claims the court erred in admitting evidence of her involvement in a fraud scheme as impeachment and evidence of her involvement in a jail fight to show her own violent character. We find no error and affirm.

FACTS AND PROCEDURAL HISTORY

*Events Prior to the Shooting*

Machleit, originally from Orange County, began dating Anderson in 2017 and soon learned he was a member of the Public Enemy Number 1 gang (also known as PEN1 or PEN1 Death Squad) a gang with roots in Orange County. In 2017, Machleit moved with Anderson into a house in Oceano. In May or June of 2018, Govey, who was Anderson's older "homeboy,"

2

began living with them.  Govey was also a PEN1 member and was also known by his gang nicknames, "Evil" or "Evil One."

Machleit testified that she knew that Govey had a reputation as a violent man with a history of stabbing people and that he had been charged with solicitation to commit murder.  Govey bragged about his violence, including that he had stabbed people in prison and had beaten up the last person who had called the police about him "within an inch of his life."

In the Oceano home, Govey was angry, violent, and would go into rages.  He also kept an eight-inch knife in his belt holster and would threaten other residents with it.  Govey's specific violence towards Machleit prompted her to tell Anderson she wanted Govey to leave.

In August of 2018, Anderson and Machleit moved to Santa Maria.  They moved in with two others -- Tiffany and Uncle T.  Govey was not supposed to join them because Machleit was scared of him.  Machleit gave Govey her Lexus so he could go back to Orange County.

Two to three weeks after they moved, Govey showed up in the Lexus.  After Anderson allowed Govey to move into the garage Govey continued to be violent.  On one occasion he screamed, "You're all going to die."  Anderson talked with Govey about leaving, but Govey convinced him to let him stay by mentioning their gang connection and Govey's status as Anderson's gang "homeboy."  Machleit testified that she started staying in her room soon after Govey arrived in Santa Maria because she was scared of him due to his reputation and his past violence.  She also testified that she did not call the police for protection from Govey because of Anderson's gang affiliation and Govey's history.

Uncle T. died in December of 2018, and when Machleit cleaned out his bedroom she found a shotgun with ammunition.

3

Machleit testified that she didn't want Govey to get it, so she put the shotgun and ammunition in the attic. Govey took over Uncle T.'s first-floor bedroom without anyone's permission.

At some point, Benjamin Mersai moved in to the home, which Machleit testified was "for protection" against Govey. Mersai testified that he worked with Anderson and he had been asked to move in because "there was this feeling that they wanted extra hands around in case Joseph Govey was extra destructive one day." Mersai was a former bouncer and trained in martial arts.

Machleit told Anderson about a particular violent incident with Govey around Halloweeen and in response Anderson started carrying a firearm with him. Anderson and Machleit often stayed in the locked bedroom. Mersai testified that in early November or early December, Anderson, Machleit, and he discussed how to get rid of Govey.

*The Shooting*

Machleit and Mersai were the only witnesses who testified directly to the events related to the shooting. Machleit testified that she awoke at 10:00 a.m., Govey was downstairs yelling about the internet, demanding that it be turned on. Machleit and Anderson were in their bedroom. Govey broke down the door of the bedroom holding a knife and saying, "turn the fucking internet on," while "waving his knife around." Machleit testified she was shaking in fear, hyperventilating, and that Anderson picked up a firearm to protect them, but it wouldn't fire. Machleit stated that Anderson froze, and the color drained from his face. She described Govey's eyes as dilated and that he looked like "an evil possessed demon" and he looked like he was going to hurt them.

Machleit also testified that Mersai came to the bedroom behind Govey and told him "it's time to leave" to which Govey

4

responded "I'm not going anywhere. This is my fucking house." Govey then went down the stairs. Anderson followed after Govey with the firearm in his back pocket, but Machleit testified she took the firearm and put it on the bed because she was concerned that a live round in a firearm that had misfired might go off. Anderson and Govey were downstairs and Machleit believed that Govey was going to leave the house finally. She stated she went to Mersai and said "I need to get in the attic." Machleit also said that things were moving fast, and she just knew that Govey was going to stab Anderson.

Machleit retrieved the shotgun by having Mersai boost her up into the attic. She told Mersai, "we need to save [Anderson]," and claimed that Mersai didn't talk her out of it. Machleit placed one "slug" in the shotgun. She had played with it before, enough to know it would hold several slugs, but had never fired it. Machleit then went downstairs to the landing between the two floors and peaked into the kitchen where Govey and Anderson were arguing. She saw Govey with "his knife out" and Anderson "plastered" to the side of the oven. Anderson was not moving or saying anything. She described him as "scared for his life."

Govey became aware of Machleit at some point and said to Anderson, "Is your bitch going to shoot me?" Machleit turned back to Mersai, who was still on the third floor and said "we need to save [Anderson]." Mersai said he would set off a fire alarm, which he did. Machleit then went back to the kitchen. Govey had moved, but Anderson was still near the oven. Machleit gave conflicting testimony about how far away Govey was from her when she fired. She first said it was seven to 12 feet and then gave an estimate based on a distance in the courtroom that was established as 20 feet. Machleit also testified that Govey did not move towards her before she shot him.

Machleit said that at the time she pulled the trigger, she was thinking that she had to save Anderson and that Govey was going to kill Anderson, her and Mersai.  She believed Govey was going to kill them because he "had kicked in a locked bedroom door.  He looked possessed and demonic.  His eyes were glassed over.  He was being the aggressor.  He had the knife, he wasn't putting it away, and he wasn't leaving."  Machleit also testified that Govey was not calming down and "it was escalating."

Mersai's testimony differed from Machleit's version in some material respects.  He testified that he, Machleit, Govey, and Anderson were all home on December 3, 2018, and they had all used methamphetamines recently and had not slept.  Mersai was in the third-floor office area.  Machleit and Anderson were in their third-floor bedroom.  Around 7:00 a.m., Mersai, heard Govey loudly go up the third floor, scream at Machleit and Anderson that he wanted drugs from them, and then kick in the closed door to their bedroom.  Mersai then heard Govey say, "You're trying to shoot me."

Mersai entered the bedroom and saw Govey facing Machleit and Anderson while brandishing a knife.  Anderson was holding a firearm.  Mersai had a wooden baton and told Govey to leave, but Govey refused and said it was his house.  Govey threatened to kill Mersai, tie Mersai up, and make him watch while Govey killed his family.  Govey backed out of the room and was followed by Anderson.  Mersai saw Govey and Anderson go downstairs to the kitchen.  He said they were "try[ing] to calm each other down."  He also testified that Anderson pocketed the firearm and Govey was no longer holding the knife.

Mersai returned to his living area on the third floor.  He watched as Machleit peered into the kitchen and said that Govey and Anderson were talking in the kitchen. Mersai heard Machleit say she "couldn't handle it anymore."  She walked away and

returned holding a firearm and said she was "tired" of Govey and was "going to go take care of it."  Mersai had never before seen Machleit with a shotgun, but he testified that she appeared comfortable with it.

Machleit went down to the second floor, but returned, and said she could not do it because Anderson was positioned in such a way that she could not get a clear shot.  Knowing there were laborers working nearby, Mersai suggested setting off the smoke alarm to disguise the sound of a gunshot, and did so.  As soon as it went off, Machleit ran downstairs.  Mersai heard a gunshot a moment later.  When Mersai went downstairs, he saw that Govey was dead from a gunshot wound.  When Govey's body was moved, Mersai saw a knife under Govey "near his seat area where he was sitting."  Mersai also acknowledged that when he first spoke to law enforcement, he reported that the knife was in Govey's back pocket and it slipped out when he lifted the body.

*Disposal of Govey's Body*

According to Mersai, he, Anderson, and Machleit moved Govey's body down to the garage and the three of them wrapped Govey's body up and put him in the trunk of the Lexus.  They discussed disposing of Govey's body at Black Lake Golf Course, where Mersai used to work.  According to Mersai, Machleit participated in that discussion, asking how easy it would be to find the body if it were hidden in the tall reeds of the pond.

Mersai said that Anderson removed both of Govey's legs with a reciprocating saw he purchased for cash for that purpose.  According to Mersai, Machleit helped Anderson by holding a leg so that Anderson could saw it off.  Machleit testified she didn't know the legs were taken off until years later when she was questioned by law enforcement.  Govey's legs were put in a suitcase and placed put in a dumpster.  The rest of Govey's body was put in a tote and put in the trunk of the Lexus.  Mersai drove

7

the Lexus, and Anderson drove his Porsche to a friend's home in Black Lake Golf Course. Machleit was with them. There, they took a golf cart to the maintenance yard, placed Govey's body in a golf cart, and Anderson and Machleit drove the golf cart to the lake where they hid the body in the reeds. Machleit testified that she wanted to call the police after the shooting, but Mersai and Anderson told her not to.

*Recovery of Govey's Body and Machleit's Arrest*

In September 2020, Mersai reported the shooting to law enforcement. He brought law enforcement to Black Lake Golf Course where the body was recovered. The following day, Machleit and Anderson were arrested together and placed in the rear seat of a patrol vehicle. Machleit told Anderson, in a conversation that was recorded, "We're going away for a long time. We're fucked. [Mersai] told them everything."

DISCUSSION

*The Trial Court Properly Excluded Evidence of the White Supremacist Ideology of the AB*

Machleit contends that the trial court erred in excluding evidence of Govey's membership in the AB and that our review of that decision should be *de novo*. We disagree.

*Standard of Review*

Evidentiary rulings, including decisions to exclude evidence under Evid. Code Section 352, will not be overturned on appeal absent an abuse of discretion. (*People v. Hardy* (2018) 5 Cal.5th 56, 87. "[A] trial court's discretionary ruling under [Evid. Code § 352] 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner . . . .' " (*People v. Williams* (2008) 43 Cal. 4th 584, 634-635.)

Machleit's reliance on *People v. Albarran* (2007) 149 Cal. App.4th 214 (*Albarran*) is misplaced. Machleit argues that

8

"where a defendant's constitutional rights are affected by the error, an appellate court applies a *de novo* standard of review, according the trial court no deference."

In *Albarran*, the trial court had granted a new trial on a gang enhancement because of a lack of evidence, but denied a motion for new trial on the charged offenses, even though extensive inflammatory gang evidence had been admitted that was irrelevant to the charged crimes. The Court of Appeal concluded that the case was "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered defendant's trial fundamentally unfair." (*Albarran, supra*, 149 Cal.App.4th at p. 232.) The court expressly acknowledged that it was departing from the general rule that evidentiary rulings are reviewed for abuse of discretion. (*Id.* at pp. 224-225.) That general rule applies in this case.

### Self Defense and Defense of Others

A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend herself (or others) from imminent threat of death or great bodily injury. Under such circumstances, the killing is not a crime. (§§ 197, 199; *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) " '[T]he defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.' . . . The threat of bodily injury must be imminent . . . 'and any right of self-defense is limited to the use of such force as is reasonable under the circumstances. . . . ' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065, citations omitted.)

### The Violent Victim Rule

"It has long been recognized that where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible." (*People v. Rowland* (1968)

9

262 Cal.App.2d 790, 797.) Such evidence may tend to show "the defendant's apprehension of danger" as well as "that the victim was probably the aggressor." (*People v. DelRio* (2020) 54 Cal.App.5th 47, 55-56 (*DelRio*).) Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence. (*People v. Wright* (1985) 39 Cal.3d 576, 587-588.)

*Evidence Code Section 352 and Gang Affiliation*

Under Evidence Code section 352, "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." To assess "probative value" the court considers the "relevance, materiality and necessity" of the evidence. (*People v. Shader* (1969) 71 Cal.2d 761, 774 (Tobriner, J.).) "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " (*People v. Karis*, (1988) 46 Cal.3d 612, 638.)

Gang affiliation evidence is widely recognized as presenting significant risks of prejudice. "We recognize that gang-related evidence 'creates a risk the jury will improperly infer the defendant has a criminal disposition' and that such evidence should therefore 'be carefully scrutinized by trial courts.' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691.) Such evidence potentially has a "highly inflammatory" impact on juries. (*People v. Williams* (1997) 16 Cal.4th 153, 193.) "To guard against the prejudicial effect of gang evidence, the Legislature recently

enacted, which requires courts to try gang enhancements separately from the underlying offense upon a defendant's request. (Stats. 2021, ch. 699, § 2, subd. (f).)" (*People v. Hin* (2025) 17 Cal.5th 401, 477.)

Applying these principles here, we conclude that that the trial court did not err by narrowly excluding the AB evidence. The trial court allowed extensive evidence of Govey's gang activities that were relevant to his history of violence and to Machleit's defense that killing him was justified as self-defense. However, through four rulings over the course of the trial, the court properly excluded specific evidence of the white supremacist ideology of the AB prison gang.

Prior to trial, Machleit filed a motion to introduce evidence of Govey's character. Specifically, as relevant to this appeal, Machleit sought to admit evidence that Govey was a "validated member of the notorious [PEN1] – a hybrid racist skinhead gang, street gang and prison gang out of Southern Orange County that falls under the umbrella of the murderous [AB] conglomeration."

Machleit proposed presenting the testimony of an expert, retired Orange County probation officer Lowell Smith, because he "supervised probationers associated with white supremacist gangs, skinheads, and Neo-Nazis" and was "considered an expert on the Orange County white supremacist group [PEN1]." Smith also "supervised Govey in his capacity as a probation officer for high-risk offenders and is intimately familiar with Govey's character of violence."

At the hearing, Machleit's counsel asserted that Govey's association with the AB showed he was an "enforcer" willing to engage in extreme acts of violence to pursue the objectives of the AB and PEN1. In response, the prosecution contended that there was no evidence that Govey's actions at issue in the case were on behalf of the gang. Machleit's counsel conceded that the events

11

at issue were not gang-related, but that the gang affiliation was why Machleit, Anderson, and Mersai could not use the normal recourse of going to the police.

The trial court observed that the proposed gang evidence was highly inflammatory and noted that such evidence was commonly bifurcated in gang cases. The court also expressed concern that if evidence of Govey's gang affiliation were admitted, it would open the door to evidence of gang affiliation for all of the residents, including Machleit.

The prosecution argued the AB evidence was remote in time whereas the links of Govey and Anderson to the PEN1 gang was more current. The prosecution also argued that there were avenues to introduce evidence of Govey's violent character without "inflaming the jury" with evidence of his affiliation with the [AB].

In considering these issues, the trial court balanced Machleit's right to present her defense and the prosecution's right to exclude inflammatory evidence about the victim by inviting both counsel to articulate where the "analytical line" should be drawn. The court also recognized that the application of Evidence Code section 352 to the AB issue was "fraught" and that a more developed understanding of the evidence was necessary to "use [Evidence Code] 352 like a scalpel." In this respect, the court properly assessed the probative value of the AB evidence (i.e. its necessity in light of the other evidence the jury would hear about Govey's violent character and gang affiliations) as well as the potential for undue prejudice if the evidence were admitted.

After several sessions of pretrial argument, the trial court ruled that it would allow targeted voir dire on gangs but would not allow voir dire about the AB. The court explained, "[w]hether or not [AB] related evidence will be allowed will be determined by

12

two things: One, exactly what [Mersai] testifies to; two, a [Evidence Code] 402 [review] of the defense expert, or at least further consideration of how far up the gang tree we need to go if, in fact, [Govey] and others at that address were members of a street gang-affiliated with a prison gang, the [AB]."

Before opening statements, the trial court gave further consideration to the AB issue when it conducted the Evidence Code 402 hearing of the defense gang expert. After hearing Smith's testimony, the court ruled that counsel could not address gangs, including the AB, in opening statements.

Right before Machleit took the stand, the trial court ruled that she could not identify the AB as Govey's prison gang, but she could testify about the identity of the PEN1 gang if it was relevant to the reasonableness of her fear of Govey. The court considered the relevance of the AB evidence to be "very slight" and its "prejudicial impact potentially great." Because the name of the gang "implies the ideological component" of white supremacy, the court ruled that neither the ideology, nor name of the gang could be mentioned.

In response to the defense contention that the exclusion violated Machleit's "due process and Constitutional right to present material and relevant evidence in her defense" the trial court reiterated that its ruling was intended to be narrow. "The Court made a [Evidence Code] 352 ruling as to that particular small portion of the evidence, and it did so in consideration of the rulings or potential rulings that'll come shortly. It represents an analysis of all of the [Evidence Code sections 1101 and 1103] issues and striking the balance in considering [Machleit's] Constitutional right to present evidence and the People's due process right to a fair trial. It's a minimal evidentiary exclusion . . . ."

13

Machleit filed an additional motion arguing that Smith should be able to testify about the "reputation for violence and reach" of the AB as well as the "sociological and psychological underpinnings of those in a prison gang like the [AB]." Much of the argument in the motion linked Smith's testimony to both PEN1 and the AB. On October 27, 2023, the trial court made its final ruling on the scope of Smith's testimony as it relates to white supremacist gangs. Smith was precluded from mentioning "gang ideology as it relates to supremacy." The court also ruled that Smith could not "indicate that he's an expert on white supremacist gangs [and could not] mention the [AB]."

The trial court explained its reasoning: "The issue is not the [AB]. It adds nothing to the case other than prejudice to the People's case. Its probative value in this case is extremely low. . . A gang expert's particular expertise as to a specific gang is often relevant. It isn't here. It does not hamstring the defense from presenting an expert who's an expert in gangs. The gangs in Orange County, statewide, whatever, motorcycled gangs, I'm not stopping him from saying. But the issue of a gang's ideology given the players in this case, given the lack of gang motivation or any gang issue other than [Machleit's] fear, he can testify that [Govey] was in [PEN1], he can testify that [Govey] was in a prison gang, he can testify to the specific acts of violence [which had been ruled admissible from Govey's prison file]."

Machleit has not demonstrated that anything in this ruling precluded Smith from testifying about the violent nature of Govey's prison gang, including its "reputation for violence and reach" provided its name and white supremacist ideology were not mentioned.

Smith was permitted to testify at length about Govey's history of violence and his membership in both the PEN1 gang and another gang (unnamed but referring to the AB), which

14

Smith described as a "very, very severe, serious prison gang." He repeated that "it's a prison gang, very, very structured prison gang and very serious." Smith also testified that the prison gang Govey was associated with was considered a violent one and that Govey was a "validated" member of it with monikers of "Evil" and "The Evil One." That moniker, Smith testified, "tells you a lot about what his reputation and history is," which is "[b]eing prone to violence, being unpredictable, very unstable." Smith further testified that lower subordinate gang members and associates feared Govey and that Govey was known to carry shanks, a homemade knife-edged weapon. Smith had read Govey's confidential prison file and found that there were specific instances of Govey engaging in violent and threatening behavior, including threats to correctional officers. There was also a history of Govey threatening people in the general community. Smith also testified that, if someone like Govey was "throwing out his gang association and moniker," that would be a form of intimidation.

Finally, Smith was allowed to testify to the ramifications of calling law enforcement on an individual associated with a violent prison gang and with PEN1 were serious for another gang member and could result in serious retribution. The discipline for such snitching, he explained, could include a beating, shanking in "non-vital areas," or gang leadership could determine that the discipline could "go lethal."

During the defense closing argument, Govey's gang affiliation was mentioned at least 20 times, and on seven occasions he was referred to as an "enforcer" of a "violent prison gang." The fact that he was feared by members of his own gang was also mentioned multiple times. And throughout the closing, counsel referred to Govey by his gang moniker – "Evil". The end of the closing aptly encapsulates the corpus of evidence counsel

15

was able to refer to in support of Machleit's contention that it was reasonable for her to believe she acted in self-defense due to Govey's violent character. "When [Machleit] pulled that trigger, she was terrified and defending against a volatile, vicious and violent enforcer of a prison gang who went by the name of Evil."

In light of this record, we conclude that the trial court's rulings, individually and collectively, sit well within an appropriate exercise of discretion. Machleit was able to present substantial evidence of Govey's violent past conduct including membership in violent street and prison gangs. The excluded evidence related to the AB and its white supremacist ideology had little probative value considered in the context of all the other evidence of Govey's violent propensity that was introduced.

The trial court's assessment of prejudice was also reasonable. The highly inflammatory nature of any gang evidence is well established. Machleit conceded as much in her trial court briefing. She acknowledged "it is a rare instance where a defendant actually wishes to introduce evidence of gangs. Especially in light of *potentially prejudicial effect* such testimony can have on jurors particularly when there is not a gang enhancement charged." (Italics added.) The court properly found the narrow category of evidence it excluded to be highly prejudicial. This conclusion is supported by the broad recognition in our caselaw and statutes that gang evidence can be prejudicial.

It is also supported by an additional critical consideration here – that the white supremacist ideology of the AB would compound the inflammatory impact of the gang evidence. The issue for the jury here was whether Machleit was justified in killing Govey because of her reasonable belief he presented an imminent threat. If the admitted gang evidence were supplemented with the fact Govey was part of a gang notorious for its white supremacist views, it would create an obvious risk

16

that the jury might factor into its deliberations the general repugnance of such ideology and use it to decide that Govey's killing might be "justified" in some broad moral sense untethered to the legal principles of self-defense recognized in the law.

Finally, the fact that the anticipated prejudice might benefit the *defendant* by creating an emotional bias against the *victim*, as opposed to the more typical case in which a defendant's gang affiliation is at issue and the concern is that the gang evidence may create an unwarranted inference of guilt, does not negate the risk that the jury would decide the contested question of Govey's actions and Machleit's response based on emotion. The trial court did not abuse its discretion in excluding evidence of the AB.

Even if we were to conclude the trial court erred, such error would not require reversal because Machleit has not shown a reasonable probability that she would have obtained a more favorable result if the AB evidence had been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The jury was presented with substantial evidence of Govey's violence and prison gang affiliation and still rejected Machleit's defense, a conclusion that was supported by substantial evidence. This included her own narrative about how she left the kitchen to retrieve the shotgun and coordinated with Mersai to set off an alarm to mask the sound of shooting she planned to execute when she returned to the kitchen; Mersai's testimony undermining the contention that Govey was wielding a knife when he was shot; and Machleit's admissions when arrested. Also, Machleit's contention that excluding the AB evidence rises to the level of a constitutional violation lacks merit and thus the standard of "harmless beyond a reasonable doubt" in *Chapman v. California* (1967) 386 U.S. 18, 24, does not apply.

17

*The Trial Court Did Not Err in Declining to Give a Pinpoint Instruction*

With respect to Machleit's instructional challenge, "[w]e determine whether a jury instruction correctly states the law under the independent or de novo standard of review. . . . Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' . . . ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. " [Citation.]' . . . 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' . . . " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088, citations omitted.)

"Under appropriate circumstances, 'a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' [citation]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99, as modified (Oct. 27, 2004).)

Where a standard instruction "adequately covered the valid points in the proposed pinpoint instruction" it is not error for the trial court to have declined to give the pinpoint instruction. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) Machleit contends that the trial court "deprived [her] of her right to have the jury instructed on her defense to the charge of murder"

18

because it rejected a pinpoint instruction. This contention lacks merit.

The pinpoint instruction Machleit sought was as follows: "Character Evidence of the Decedent: You may consider evidence of the aggressive and violent character of the decedent. You may consider whether the decedent had a propensity for violent aggression and on the date of the incident conformed to his character, forcing the defendant to resort to deadly self-defense. If you conclude the defendant knew that the decedent had previously engaged in violent acts, that may show the defendant's fear of the decedent was legitimate. On the other hand, if you conclude the defendant did not know the decedent had previously engaged in violent acts, that may show the decedent was probably the aggressor. A person who is turbulent and violent may more readily provoke and be the aggressor in an encounter."

This instruction was requested to supplement the CALCRIM 352 instruction that the trial court had determined to give, which, in pertinent part stated: "You have heard evidence that [Govey] was a violent person and had a character trait for violence . . . . A person's character for violence may be shown by evidence of reputation, opinion or specific acts. Evidence of a person's character for violence may tend to show the person acted in conformity with that character trait."

In addition, the Court instructed the jury with CALCRIM 505 which in relevant part provided:

"Justifiable Homicide. . . . The defendant is not guilty of murder or manslaughter if she was justified in killing someone in defense of another. The defendant acted in lawful defense of another if: [¶] (1) The defendant reasonably believed that [Anderson] was in imminent danger of being killed or suffering great bodily injury or that she, [Anderson], and [Mersai] were in imminent danger of being victims of assault with a deadly

19

weapon under circumstances in which she reasonably believed that she or they would suffer great bodily injury or death; [¶] (2) The defendant reasonably believed that the immediate use of deadly force was necessary to defend against the danger; and [¶] (3) The defendant used no more force than was reasonably necessary to defend against the danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to someone else. Defendant's belief must have been reasonable and she must have acted only because of that belief.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that she or someone else was threatened may be reasonable even if she relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"If you find that [Govey] threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. If you find that the defendant knew that [Govey] had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person."

The Court declined to give the proposed pinpoint instruction, finding that it was both duplicative and argumentative.

In addition to Evidence Code section 1103, Machleit relies on *DelRio*, *supra*, Cal.App.5th 47, *People v. Rowland* (1968) 262 Cal.App.2d 790, and *People v. Smith* (1967) 249 Cal.App.2d 395. However, none of these cases involved jury instruction issues; they all dealt with the admissibility of character evidence. The rationale for permitting the introduction of character evidence cannot be translated directly into an instruction to the jury on how it should consider that evidence in reaching a verdict. Yet that is what Machleit's proposed pinpoint instruction attempted to do, which made the proposed instruction both unnecessary and argumentative.

Machleit's principal authority on this issue is *DelRio*, *supra*, 54 Cal.App.5th 47. There, the defendant was charged with murder arising from a gunfight in which he and the victim were the only witnesses. Both had fired their weapons multiple times, with 17 cartridge casings found at the scene of the shooting. The trial court excluded character evidence of the decedent which defendant contended would show his "propensity for violent aggression." (*Id.* at p. 54). In discussing why the evidence should have been admitted under Evidence Code section 1103, subdivision (a)(1), the court stated, "This rule allows [a defendant] to try to prove the conduct of [a victim] conformed to his character. Specifically the exception allows what is usually forbidden: It permits [the defendant] to introduce evidence [that the victim] had a propensity for violent aggression. This evidence would aid [the defendant's] effort to prove that, at the crime scene, [that the victim] was violently aggressive, which forced [the defendant] to resort to deadly self-defense. [Citation.]." (*Ibid.*)

21

That the *DelRio* court chose to articulate its rationale for why propensity evidence should have been admitted in the particular circumstances of that case, by tying it to the defense argument of being "forced . . . to resort to deadly self-defense" does not support incorporating such language into a jury instruction. This is particularly so because the court in *Del Rio* emphasized the unique "factual context" in that case: "We are uncertain what happened at the scene. We have a gunfight with no independent witnesses and with no motive for murder. We know both men had loaded guns, both men fired at each other, and [the defendant] killed [the victim]. We know [the defendant's] version but a person on trial for murder has motive to fabricate. Who drew first? That question is key." (*DelRio*, *supra*, 54 Cal.App.5th at pp. 56-57.)

Here, the trial court properly concluded that the proffered pinpoint instruction was unnecessary and argumentative. Taken together, the instructions given by the court adequately covered the valid elements of Machleit's proffered pinpoint instruction.

The jury was instructed through CALCRIM 352 that it could consider evidence that Govey "was a violent person" and "had a character trait for violence" and that such "[e]vidence of [Govey's] character for violence may tend to show [he] acted in conformity with that character trait." The jury was also instructed through CALCRIM 505 that, if it found that Govey "threatened or harmed the defendant or others in the past, you may consider that information in deciding whether defendant's conduct and beliefs] were reasonable." That same instruction also told the jury that if it found "the defendant knew that Govey had threated or harmed others in the past, you may consider that information in deciding whether the defendants conduct and beliefs were reasonable."

22

The trial court also properly concluded that the proposed pinpoint instruction was argumentative. An argumentative instruction is " 'of such character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) For example, *People v. Wright* (1988) 45 Cal.3d 1126, 1137, discussed an instruction that was deemed argumentative because it " 'direct[ed] the attention of the jury to specific testimony and [told] the jury it may look to that testimony for the purpose of forming a reasonable doubt on an issue.' "

Here, CALCRIM No. 505, as given, referred to Govey possibly threatening or harming Machleit or others in the past and told the jury that they could consider such evidence in deciding whether Machleit's conduct and beliefs were reasonable. In contrast, the proposed instruction was not neutral, but defined Govey's prior conduct for the jury in terms of aggressiveness and violence without letting the jury itself make that determination.

Moreover, CALCRIM No. 505 as given, told the jury that they could use evidence of Govey's violent character in determining whether Machleit's conduct and beliefs were reasonable. In contrast, the proposed pinpoint instruction said that the jury could consider whether the Govey had a propensity for violent aggression but used language suggesting that the mere evidence of such propensity would be considered to have "forc[ed] the defendant to resort to deadly self-defense." The proposed instruction thus took from the jury the determination, based on all of the evidence, whether Machleit's conduct and beliefs were reasonable.

Additionally, CALCRIM No. 505 as given, instructed the jury that it could consider Govey's past violent threats or harm to others, whether Machleit knew of it or not, and could use that information in deciding whether Machleit's conduct was

23

reasonable. Machleit's proposed instruction did not use such neutral language. Instead, it told the jury that evidence of past violence that Machleit was aware of may show Machleit's fear was "legitimate." Again, this improperly narrowed the jury's focus from the totality of the circumstances that would be relevant to determining if her conduct was reasonable. The reasonableness of any "fear" she held was only one part of that assessment. The proposed instruction also added a gloss to how the jury might consider Govey's past violence that Machleit was unaware of by telling the jury it "may show the decedent was probably the aggressor." This also rendered the instruction argumentative by overly emphasizing the issue of who was the aggressor and disconnecting it from the question of whether Machleit's actions were based on a reasonable fear of imminent harm.

Finally, the proposed instruction referred to a person "who is turbulent and violent" and told the jury that such a person "may more readily provoke and be the aggressor in an encounter." This language was an alternative formulation of the argumentative proposition it followed. It suffered from the same flaws, but with the added defect that it was redundant.

For all these reasons, the trial court did not err when it denied Machleit's proposed pinpoint instruction.

Even if the rejection of the instruction was error, it would not require reversal because there was no reasonable probability of a different result in light of the other instructions provided to the jury. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 825 (*Gutierrez I*).)

*Admission of Evidence of Machleit's Involvement in Fraudulent Conduct with Anderson was not Error*

Machleit contends that the trial court committed error in allowing evidence related to her involvement in a pending case regarding automobile theft by fraud.

The evidence was the subject of a pretrial motion by the prosecution which argued for its admission as impeachment. The specific evidence related to purchased vehicles using false identification. Machleit's trial counsel argued the evidence was highly prejudicial and lacked any probative value.

Prior to Machleit's testimony, the trial court found that the evidence of automobile fraud involved moral turpitude, was not similar to the charged offense, but was "directly probative to the issue of credibility." The court found that the consumption of time would be minimal to present such evidence and that the probative value was not substantially outweighed by the prejudicial effect.

On cross-examination of Machleit, the prosecution was also allowed to introduce a photograph of a fake driver's license and a picture from the automobile dealership of Machleit disguised with a fake blonde wig and fake pregnant belly. In objecting to the photographs, defense counsel argued the evidence was prejudicial and "[it] is not narrow, it's not brief, it's not sanitized, and it's to inflame the jury against [Machleit]." Defense counsel also argued the fraud was remote in time (a year and a half after the shooting) and that Anderson had pled guilty while she had not been convicted.

The prosecution argued that the evidence was directly relevant to credibility "which is extremely significant in this trial." The prosecution also argued "[Machleit] has also made an issue of her affiliation with [Anderson] and him as

a gang member. So whether or not she's committing crimes with this gang member is significant because she is identifying herself as the only person in [the Santa Maria] house who isn't of that ilk."

The trial court allowed two photos (while excluding three others) finding that the evidence was directly related to Machleit's credibility, was narrow and tailored, and the conduct depicted was not inflammatory, particularly in relation to the charges in this case. Machleit makes four arguments for reversal on this point. First, she had not been convicted of any fraud. Second, the photos added nothing to the allegations of fraud, were inflammatory and likely to elicit an emotional response. Third, the conduct occurred after the killing of Govey. Fourth, the conduct was very different from what was charged in this case.

All of these arguments lack merit. Machleit testified to her conduct and the circumstances were further evident from the photographs. Prior conviction was not a prerequisite for admitting the evidence. (*People v. Wheeler* (1992) 4 Cal.4th 284, 297 [immoral conduct admissible for impeachment may be shown by evidence of the acts without any conviction].) Also, the planning entailed in the automobile fraud depicted by the photos showing false identification and the Machleit in a disguise at the dealership was probative of Machleit's dishonesty. Her credibility was a critical issue for the jury.

Machleit has not articulated any reasoned explanation for why a photo showing Machleit in a disguise at an auto dealer would be "inflammatory" and we can discern none, particularly in the context of this case as a whole. The record was riddled with violence, including violence by street gangs and prison gangs. There was also evidence of widespread

methamphetamine use, including by Machleit. And, of course, there was evidence of the shooting of Govey, the gory clean-up of the kitchen that followed and the ensuing mutilation and disposal of Govey's body. Against this backdrop, the disguise evidence was not likely to provoke an emotional bias against the Machleit.

Finally, the contention that the fraud evidence was unrelated to the crime being tried, misses the point. The evidence was offered for impeachment. The trial court did not err in finding that it had sufficient probative impeachment value to be admitted and was not unduly prejudicial.

Even if the admission of the evidence was error, reversal would not be required as Machleit has not demonstrated a reasonable probability that she would have obtained a more favorable result if the evidence had been excluded. (*Watson, supra*, 46 Cal.2d at p. 836.)

### *Admission of Evidence of Machleit's Involvement in a Jail Fight was not Error*

Machleit contends that evidence of her involvement in a jail fight should have been excluded.

The prosecution proffered evidence under Evidence Code section 1103 subdivision (b), of a fight between Machleit and another inmate on November 20, 2021. Evidence Code section 1103, subdivision (b) permits the prosecution to present rebuttal evidence of a defendant's "character for violence (in the form of … evidence of specific evidence of conduct)." A predicate for such rebuttal evidence is that the defendant has adduced "evidence that the victim had a character for violence or trait of character tending to show violence." Here, Machleit had shown extensive evidence of Govey's past violence.

27

The prosecution proffered testimony from Anita Arteaga, a custody deputy in the Santa Barbara jail. She was examined at a 402 hearing and testified to hearing a commotion in the jail and then observing Machleit and another inmate arguing. It appeared to Arteaga that Machleit and the other inmate, Anna Arevalos, had just fought. Arevalos was upset and said "that bitch just hit me for no reason" pointing to Machleit. Arteaga also testified that Arevalos had a swollen left eye. The trial court concluded that the statement by Arevalos was a spontaneous statement and the testimony would be allowed.

Arteaga then testified to the incident before the jury. On cross-examination, Arteaga acknowledged that she did not see how the fight had started and that during the time she was supervising Machleit's unit, Machleit was "not known to be a troublemaker or violent person."

Machleit cites *Gutierrez I, supra*, 45 Cal.4th 789, for the proposition that even a prior conviction for battery can be excluded if it arose from an unrelated incident. She attempts to reason that, because the jail fight was unrelated to the murder and she has not been convicted of the alleged battery, the evidence should have been excluded. We are not persuaded.

In *Gutierrez I, supra*, 45 Cal.4th 789, the trial court excluded evidence that a murder victim had been convicted of battery in a situation where the "defendant's only defense was an alibi" which rendered the evidence of the prior battery conviction irrelevant. (*Id.* at 827.) There, the defendant contended that he quarreled with his girlfriend when he arrived to pick up his son, she scratched him, cursed at him, they kicked each other, but he ultimately walked away. The defendant also argued that, after he left with his son, two unnamed cohorts, who had accompanied him, murdered his girlfriend. On appeal, the defendant argued that the jury should have been instructed on manslaughter and

28

that the victim's prior conviction for battery showed "propensity for violence [that] was relevant to show that he was engaged in mutual combat with the victim and committed voluntary manslaughter rather than murder because he killed her in the heat of passion." (*Id.* at p. 828.) The Court of Appeal rejected the defendant's provocation argument entirely. (*Id.* at p. 827 ["rather than causing defendant to become enraged, defendant testified that he simply walked away"].)

*Gutierrez I, supra*, 45 Cal.4th 789 is distinguishable from the instant action, where Machleit's defense put the victim's propensity for violence at the forefront, thus establishing the predicate for rebuttal evidence of the defendant's own propensity for violence. In *Gutierrez I*, the victim's propensity for violence was completely irrelevant.

Machleit also argues that the jail fight took place three years after the killing and "is irrelevant to [her] state of mind at the time of the shooting." But there is no bright-line rule that violent propensity evidence has to predate the crime being tried to be relevant. (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448.) The remoteness of time, either before or after the charged crime, may affect the probative value of the evidence, and is a factor properly to be weighed by the trial court.

We cannot say that the trial court abused its discretion in admitting the evidence of the jail fight.

Even if the admission of the evidence was error, reversal would not be required as Machleit has not demonstrated a reasonable probability that she would have obtained a more favorable result if the evidence had been excluded. (*Watson, supra*, 46 Cal.2d at p. 836.)

29

*No Cumulative Prejudicial Error*

Finally, Machleit contends that, regardless of whether the asserted errors were individually prejudicial, the "combined effect of multiple trial errors" rendered the trial fundamentally unfair creating a due process violation or alternatively establishes prejudice. (Citing *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 928; *People v. Hill* (1998) 17 Cal.4th 800, 844.)

We do not find these contentions persuasive. The trial court afforded Machleit the opportunity to present substantial evidence of Govey's violent actions and character, including gang-related evidence and it exercised its discretion under Evidence Code 352 "with a scalpel" to preclude only evidence of the white supremacist ideology of the AB. Even if we were to find that the exclusion of the AB evidence and the rejection of her pinpoint instruction was error, there was nothing close to a deprivation of her right to present evidence and have the jury instructed on her defense.

"[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely, there was no refusal to allow [defendant] to present a defense but only a rejection of some evidence concerning the defense.' [Citation.]." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

DISPOSITION

The judgment (order) is affirmed.

NOT TO BE PUBLISHED.


KELLEY, J.*


We concur:



YEGAN, Acting P. J.



BALTODANO, J.

---

* Judge of the San Luis Obispo Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31

John F. McGregor, Judge

Superior Court County of Santa Barbara

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Machleit.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Marc A. Kohm and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.